FEARY, Appellant, v. METROPOLITAN STREET RAILWAY COMPANY.

**Division One, April 16, 1901.**

1. **Negligence: RUNAWAY CAR: CONTRADICTORY FACTS: QUESTIONS FOR JURY.** Plaintiff sued for injuries alleged to have been caused by a cable car, which ran violently down a steep incline and turned over at the bottom. He claimed the gripman carelessly and negligently let the grip-lever slip from his hands and by so doing disconnected the grip-shank from the cable, whereupon the car ran away and caused the accident. The defendant presented evidence to show that the grip-shank broke as the car started down the incline, and 'the accident was due to that break; that the grip-shank was the best and most approved appliance of its kind, was new and had been in use only a few days; had been inspected on the morning of the day of the accident and found to be apparently safe and sound, and had safely carried the train down and up the incline several times that day. *Held*, it was the province of the jury to decide the conflict of facts, under proper instructions, and they having decided in favor of defendant; and there being substantial evidence to support their verdict, this court will not interfere.

2. **Practice:** EVIDENCE IN REBUTTAL. The trial court has a large discretion in the admission or rejection of evidence offered in rebuttal; and if that offered is clearly a part of plaintiff's case in chief, and no excuse or reason is given why the witnesses were not produced in their proper order, this court will not interfere.

3. ————: MODIFICATION OF INSTRUCTION: NEGLIGENCE: PASSENGER. Plaintiff can not complain that the court modifies his instructions to conform to his own theory of the case as set forth in his petition. While in cases of injury to a passenger for hire plaintiff is only obliged to allege generally and prove the relation of passenger and carrier, and the injury, in order to make out his prima facie case, yet if he limits his right to recovery to a specific act of negligence on the part of defendant's servants' he can not complain if the court, by a modification of his instructions, in like manner limits his right to recover.

4. ————: ————: NO EXCEPTIONS. The action of the court in modifying plaintiff's instructions is not open to review on appeal unless he has saved exceptions thereto at the trial, or called attention thereto in the motion for a new trial.

5. ————: INSTRUCTIONS: "STUMP SPEECH." The court told the jury that the fact that defendant was a corporation should not affect their verdict, and that the instructions must be taken and considered as having been written and read by the judge, etc., and this was objected to as being a "stump speech." *Held*, that, the instruction being the law, and it not being pointed out how it could have prejudiced the plaintiff, it was not error to give it.

6. **Negligence:** INJURIES: EARNINGS. The jury were told that "if plaintiff could have earned money by reasonable effort and neglected to do so, he can not charge his loss, if any, to defendant." *Held*, that it is purely technical to say that this instruction told the jury that if plaintiff could have earned anything, however small, and did not do so, he can not recover anything. Its reasonable meaning is that plaintiff can not recover such an amount as he might have earned by reasonable effort but failed to earn.

7. ————: ————: DAMAGES: VERDICT FOR DEFENDANT. Where the verdict is for defendant, the plaintiff can not complain of instructions relating solely to the quantum of damages.

8. ————: BURDEN: INSTRUCTION. Plaintiff's instruction told the jury that the burden of proof was on him to show that the accident was caused by the negligence of defendant street railway, and if he so

Feary v. Metropolitan Street Railway Co.

showed then the burden shifted to defendant to excuse itself. In defendant's instruction it was said: "What the court says in plaintiff's instructions as to the burden being on defendant, does not mean that you are confined to the testimony offered by defendant in determining whether the burden has been established. You are to consider all the facts and circumstances in evidence, whether developed by plaintiff's or defendant's witnesses, and if you find therefrom that there was no negligence of the character submitted, then the burden has been sustained by defendant." *Held*, that defendant's instruction was not in conflict with plaintiff's, but simply told the jury the means the defendant may employ to excuse itself.

9. Accident: INSTRUCTION: HARMLESS ERROR. Defendant's instruction, in a suit by a passenger for injury due to a runaway cable car, which dashed down an incline and turned over, said: "If the jury believe from the evidence that the injuries sustained by the plaintiff were merely the result of accident, then your verdict will be for defendant." *Held*, that it was not error that the instruction did not say "inevitable" or "unavoidable" accident.

*Held*, per VALLIANT, J., in a concurring opinion, that this instruction can not be commended, because even if the injuries were brought about by the negligence of defendant they were still "merely the result of accident." This instruction does not mean as it should have been made to mean "accident without fault on the part of defendant's servants." But although it was improperly worded, yet, as the verdict was for the right party, being the only one consistent with the evidence, the error is not reversible.

10. ———: ———: CAUSE UNEXPLAINED. In the case of accident to a passenger caused by the train getting beyond the control of the trainmen, it is not error to instruct that "if the jury can not find from the evidence the exact cause of the accident, still, if you find that there was not any negligence of the character submitted, the verdict must be for defendant." The law does not impose on defendant the high necessity of explaining the accident; it imposes only the duty of the highest degree of care in the construction and use of appliances used for operating the cars.

11. ———: CARRIER'S CARE. An instruction which requires the defendant railroad, in carrying passengers, to exercise "all the care and foresight reasonably practicable" to avoid the accident, is as broad as the liability of the carrier.

Feary v. Metropolitan Street Railway Co.

12. ————: UNAVOIDABLE CASUALTY. If the accident to the passenger was not due to the negligence, carelessness or lack of skill of the railroad's servants, but to unavoidable casualty, plaintiff can not recover for the passenger's consequent injuries.

13. **Evidence:** ADMISSION: PLAINTIFF'S CREDIBILITY. In an action for damages for injuries received in the derailment of a car, the court instructed the jury that "the plaintiff was a witness in his own behalf; the jury are the sole judges of his credibility; all statements made by him, if any, which are against his own interest, must be taken as true; but his statements in his own favor are only to be given such credit as the jury under all the facts and circumstances in evidence deem them entitled to." *Held,* that this instruction is proper in a civil case, as much as is a similar one in a criminal cause.

*Held,* by VALLIANT, J., in a separate opinion, that this instruction is inconsistent in its terms, in that, after it tells the jury that they are the sole judges of the credibility of a particular witness, it undertakes to control them in that respect. *Held,* also, that the instruction invades the province of the jury. The jury being the sole judges of the credibility of the witnesses, the court has no right to single out one witness and lay down rules for the jury to ascertain what weight they ought to give his testimony. Such instruction should not be used in a civil action.

14. **Misconduct of Jury:** NOT REVIEWABLE. Unless the misconduct of a juror is made a part of the bill of exceptions, it can not be reviewed by the appellate court. Besides, the playing of a game of cards with respondent's attorney by a juror during the progress of the trial, is not such misconduct as will upset a verdict.

Appeal from Lafayette Circuit Court.—*Hon. Richard Field,* Judge.

AFFIRMED.

*John S. Blackwell & Son, Clarence Vivion* and *Hollis & Fidler* for appellant.

(1) The court permitted the defendant to prove by witnesses that they had known plaintiff before and after the acci-

dent, and that there was no difference in his looks and appearances after and before. In rebuttal plaintiff offered to prove by three witnesses that they had known plaintiff before and after the injury and that he looked like a different man in this: That he is much lighter in weight, more pallid and dull in appearance, has not the same color and does not look as strong and healthy. This was proper rebuttal to which plaintiff was entitled. (2) The court erred in modifying plaintiff's instruction numbered 1. "Proof by a passenger of the derailment of train and his injury makes out a prima facie case of the company's negligence." Furnish v. Railroad, 102 Mo. 438; Clark v. Railroad, 127 Mo. 197; Dougherty v. Railroad, 81 Mo. 329. (3) Defendant's instruction numbered 1 is a mere abstract proposition, not predicated upon the pleadings or evidence; is a stump speech. Therefore, erroneous and prejudicial to plaintiff. Railroad v. Railroad, 118 Mo. 625; State v. Fairlamb, 121 Mo. 149; Bergaman v. Railroad, 104 Mo. 90; Fairgrieve v. Moberly, 29 Mo. App. 142. (4) Defendant's instruction numbered 2 is misleading in this: It says in effect that if plaintiff could have earned money—no matter how little—then he could not charge any of his loss to defendant. It is misleading and is not a fair statement of the law. (5) Defendant's instruction numbered 3 is not predicated on the pleadings or evidence. It is a comment and criticism on plaintiff's instructions and in conflict with the law, as declared by the court in instruction 2 given on behalf of plaintiff. It failed to enlighten the jury as to the "character of the negligence" submitted under the pleadings and evidence, but left the jury to guess at such negligence, and placed the burden on plaintiff all through the trial. Blanton v. Dold, 109 Mo. 77; Stanley v. Railroad, 114 Mo. 620; Evers v. Shumaker, 57 Mo. App. 454; Frank v. Railroad, 57 Mo. App. 181; Redpath Bros. v. Lawrence, 42 Mo. App. 101.

(6)  Defendant's instruction numbered 4 is misleading, in saying that if plaintiff's injuries were "merely the result of accident" the verdict will be for defendant.   Whilst this court has approved instructions saying that if the injury was caused by "mere accident," plaintiff could not recover, the wording of this instruction is such that a jury which had to be instructed as this jury was, by defendant's instruction numbered 1, would be very apt to conclude as there was no pretense that this injury was inflicted willfully and intentionally, it "was merely the result of accident," hence the "verdict will be for defendant."   It should not be given in this form without qualification.   This accident must have been inevitable, and one that could not have been seen, detected or known to the defendant, its agents or servants, by the exercise of the utmost practicable human skill, diligence and foresight.   Smith v. Railroad, 108 Mo. 244; Dowell v. Guthrie, 99 Mo. 653; Hickman v. Link, 116 Mo. 123; Spillman v. Railroad, 111 Mo. 555; Sullivan v. Railroad, 133 Mo. 1; Lemon v. Chanslor, 68 Mo. 346; Conway v. Reed, 66 Mo. 353; Hite v. Railroad, 130 Mo. 132; Dougherty v. Railroad, 97 Mo. 654; Coudy v. Railroad, 85 Mo. 85. (7)  Defendant's instruction numbered 5 is erroneous.   It does not correctly or fully state the admissions of plaintiff and defendant in their pleadings.   The instruction limits the issues made by the pleadings and evidence.   The instruction is argumentative and misleading, and instead of serving as a guide to the jury in reaching a verdict, it confused the jury in wandering away from the issues presented by the pleadings and evidence in the case.   The instruction is in conflict with and contradictory of the law as declared by the court in plaintiff's instructions numbered 1 and 2.   Matson v. Frazier, 48 Mo. App. 302; Altman v. Smith, 52 Mo. App. 351; Rhodes v. McNulty, 52 Mo. App. 301.   (8)  Defendant's instruction numbered 6 is grossly erroneous and fatally vicious.   It is not declarative

Feary v. Metropolitan Street Railway Co.

of the law applicable to the pleadings and evidence in this case. It is not predicated on the pleadings and evidence, or either of them. The instruction puts the defendant above and beyond the reach of the law. Clark v. Railroad, 127 Mo. 207; Furnish v. Railroad, 102 Mo. 442; Lemon v. Chanslor, 68 Mo. 340. (9) Defendant's instruction numbered 8 ignores the issues made by the pleadings and evidence. It is in direct conflict and is inconsistent with and contradictory of the law as declared by the court in instructions 1, 2 and 3, given on behalf of plaintiff. It is also erroneous in assuming that plaintiff's injuries were the result of unavoidable accident, and relieves the defendant from any proof as to how the car "got from the control of the gripman" by what "unavoidable casualty." (10) Defendant's instruction numbered 9 is erroneous in this: That there is no evidence whatever to base it on. Plaintiff testified to nothing against his interests and it is an improper, prejudicial and illegal comment on plaintiff's evidence, and in this, that it is self-contradictory, and takes away from the jury their sole and absolute right to act as judges of the evidence, and passes upon the credibility of the witness, and as matter of law directs the jury that they must accept as true certain parts of plaintiff's evidence and give such credit to the remainder as they deem it entitled to, and in this, that it is improper to give such instructions in a civil case. This instruction was copied from the criminal case of State v. Brooks, 99 Mo. 137, and is commented on in a civil case by the court in Culberson v. Railroad, 50 Mo. App. 562.

*John Welborn, William Aull, Frank P. Walsh and Frank Hagerman* for respondent.

MARSHALL, J.—This is an action for $50,000 damages for personal injuries received by the plaintiff on the twenty-

Vol 162 mo—6

seventh of July, 1896. The suit was begun in Jackson county, the venue changed, at plaintiff's instance, to Lafayette county, and resulted in a verdict and judgment for the defendant, from which plaintiff appealed.

The petition, after charging that the defendant owns and operates a street railroad line in Kansas City, for carrying passengers for hire, and that a part of its line is upon Ninth street, from Jefferson street to Union avenue, so far as it is material to this inquiry, is as follows:

"Said road is constructed with double track and operated by means of an endless steel wire cable running under ground, propelled by steam force from a power house on said line. The cars are attached to said cable by means of a device called a grip-iron, extending downward through the front car, called a grip-car, and through an iron slotted rail to the said cable and clamped by the jaws of the grip-iron. That there is a steep incline extending from defendant's depot on Union avenue, up and along Ninth street to Jefferson street, a distance of about one quarter of a mile. Said incline is about twenty per cent grade for said quarter of a mile, making said place very dangerous for travel unless great care is exercised in going up and down said steep incline. That the cars in going down the same are held from excessive speed by tightly grasping the cable with the grip-iron and applying the brakes on the cars to keep the same at the usual speed of the cable, which, when properly done, insures reasonable safety in descending from Jefferson street to said Union avenue.

"Plaintiff for cause of action states that on or about the twenty-seventh day of July, 1896, he became and was a passenger of defendant on its said Ninth street line by boarding one of its cars up-town and paying the usual fare to be transported to defendant's depot at Union avenue, all in Kansas City, county and state aforesaid. That when said train of cars

reached the top of said incline and proceeded down same in a westerly direction, said train was by the carelessness and negligence of its servants, agents and employees, permitted to descend said steep grade at a rapid and hazardous rate of speed, to-wit, fifty miles per hour, without checking or stopping the same. Plaintiff, with other passengers, was warned by the conductor in charge of said train to remain still and not attempt to get off, which plaintiff did in obedience to said instructions. That when said cars, running at said dangerous speed, reached nearly the bottom of said incline, they left the track and collided with other cars, causing a wreck, the force of which, together with the wreckage, severely and permanently injured him as follows," etc.

The answer is a general denial with a special plea of contributory negligence. The reply denied generally any contributory negligence.

The plaintiff states the facts to be as follows:

The undisputed testimony of the witnesses, both for plaintiff and defendant, shows that plaintiff, with his two sisters from New York, boarded defendant's cars at Ninth and Washington street to go to the union depot on Union avenue. The sisters, who had been here visiting plaintiff, were leaving for their home in the East. That the decline from the west edge of Jefferson street to defendant's depot on Union avenue, is between an eighteen and nineteen per cent grade, and "the distance from Jefferson street to the bottom of the incline is about twelve hundred feet." Plaintiff with his sisters was seated in the front or "grip-car" just on the left of the gripman, a trifle behind him.

Plaintiff says:

"The first I noticed the long iron lever slipped from the hands of the gripman and fell over on the floor of the car; I was sitting at the gripman's left, a trifle behind him. This was at

Jefferson street where the lever fell. The gripman leaned forward excitedly and seized the lever and made an effort to catch the rope. The train went faster and faster. By the time it reached the bottom, I judge it was going a mile and a half a minute. At the bottom the car jumped the track and turned over on its side and the top of the car was knocked off. I was hit and became unconscious. This was just under the edge of the depot. The gripman, after the car got beyond his control, said, 'Keep your seats.' On account of the car jumping the track and turning over my right eye was entirely closed so that I could not see out of it." (Then follows a description of the nature of the injuries and the extent of his damage, which is not material here.) "I have ridden down the incline many times; there is a kind of pitch-over after you get to the west side of Jefferson, going down; this is where the gripman lost his grip; there was no jar or jerk, only the increase of speed; there is some jar of a cable car all the while; nothing more that we noticed; I think the gripman told the conductor to put on brakes, apparently he did."

Martha Gray, witness for plaintiff, testified:

"I reside in the State of New York; am sister of the plaintiff; was on the car with him, on left side of the car; he sat in the same seat with me to my left; there was no one between the gripman and myself; he stood a little before me to the right. When we reached the incline the gripman turned his head and looked back; as he did so the grip-lever slipped out of his hands and fell heavily forward; he immediately picked it up; the conductor came forward; they spoke to each other in low tones; the car was going down the hill at a rapid rate; the conductor turned and went back; we held to the seat and when we reached the bottom the car left the track and was overturned; to the best of my recollection there were five distinct bumps, then the car stopped; my brother was under the

seat pinned fast; some one carried me to the waiting room; brother George was covered with blood, his eye shut and his hat broken down over his head."

Mrs. M. O. Wagy, witness for plaintiff, testified:

"Saw the plaintiff and two ladies about July 27, 1896; he was on the same cars that I was when they went down the hill at a rapid speed; just after we left the top of the hill they began going faster than usual; I was on the left-hand side of the rear car; when the car began to go faster some men jumped off; some one kept saying, 'Keep your seats;' I had not noticed anything like a jar until we got down; there was a decided jerk at the bottom; the front car was overturned."

Charlotte Feary, witness for plaintiff, testified:

"I reside in New York, was visiting my brother; he was accompanying my sister, Mrs. Gray, and myself, to the depot; we were riding in the grip-car; when we reached the top of the incline the gripman lost the grip; the brakes refused to work and the car dashed down the incline; the gripman grasped the lever and worked it frantically; he was very excited; when he reached the bottom the car jumped the track and was dashed over on its left side and was completely wrecked; Mr. Feary was thrown under the seat in which he had been riding and could not move; they dug me out and then took Mr. Feary out; his head was badly cut, face bruised and was not able to get into the carriage without help."

Frank Peck, witness for defendant, who was with defendant for many years, and "was familiar with the construction of that incline and with all the appliances and cars then in use" says, "If the grip-shank break, they loose the rope; the cable is a wire rope and runs over large wheels and is operated by machinery at the power house; the rope runs up a conduit in the middle of the track until it gets to the end of the line and comes back in a conduit in the other track until it gets to the

power house and crosses over guide poles so that the rope is in motion so long as the machinery is in motion; they move the cars by attaching to the cable with the grip which has two dies, the top and lower die, and they come together on the rope; there is a slotted rail in the middle of each track for this connection; the gripman can close or open the grip; there is a rachet on the grip-car that comes up with a bow and notches in it; there is what is called a dog with a compression spring on the grip-lever; the dog fits in the notches and holds the grip-lever from going forward and can be released by pressing the handle in front of the grip-lever, I think there is eight or ten inches of the circle-bar notched. The grip weighs between four and five hundred pounds; a coach weighs about 6,500 pounds; a grip-car without the cable weighs about 6,000 pounds; when the cable is in the grip it varies; the grip-shanks are riveted in the grip; the grip-lever can not fall over unless the dog comes out of the notches; a man can throw it over or put it over, but it can not get there any other way without it is broken, when the strain is on the rope; the dog is held in the notch by a spring; if the grip-shank breaks and the dog is in the notches, the tendency of the grip-handle is to fall back instead of forward; the dog would hold it from going forward; that spring is a compression spring; it does not take any strength hardly to raise or lower that dog; a man can do it with one finger, it can not go forward unless the dog gets out of the notch; if it be true that the grip was drawn up on the rope and the dog was in the notch and it fell forward, I could not account for it; I could not tell whether it was the fault of the gripman or whose fault it was; I could not explain it; the gripman could have thrown it forward; if a man does put it forward the effect on the rope is the same as the grip-shank breaking; this can be done on any part of the road, and when that is done the rope is bound to come out, whether the grip-shank is broke or

not; unless it is on a curve; there is a mere curve of about twenty-five degrees down where the track enters the depot, then it is straight to the back of the building; it is planked with two-by-twelve plank, ties six-by-eight, spiked down, part pine and part oak, and a slot there in the tracks and a strip of two and a half inch iron each side of the slot, or it may be faced with one-half by three-inch iron; I think it is bolted down solid."

Question: "From your experience as a railroad man, if this car went down that hill at the velocity of fifty miles per hour, and turned over there with such force that it threw out that plank and all this iron, would not that account for the breaking of the grip?"

Answer: "It might, it would be very likely to break something like that; it turning over on its side would likely break something; we always considered this a dangerous place and we fixed notches along each side of the track parallel with the cables for the purpose of hooking a hook to help hold or help check the speed of the car down the hill; but sometimes they would not take hold; we used to have a chafing iron we worked to keep the grip-shank from wearing fast; they could be operated in July but could not in cold freezing weather when the slots would close; the chafing iron has a tendency to keep the grip-shank from wearing; cars were inspected when run out in the morning and were run all day unless they were taken in for cause. If the car struck anything in the slot or come by the slack of the rope with force enough to break the grip-shank it would cause a jar, provided the grip-shank was all right. It would take coming up against something almost immovable to break it; it would make a pretty good jar, it would jar everybody in the car up, I think."

Mr. Houx, witness for defendant, testified:

"Was conductor on the car when Mr. Feary got hurt; worked for company five years; when car started down incline

was on rear platform of coach setting my brake; the first thing I noticed, my attention was called by a lady jumping up or turning around; ladies were on the coach, which was the second car; as soon as I turned around I discovered the grip had been lost or was not hold of the rope; that was right at the top of the hill; I pushed the ladies back and told them to be seated, that they could not get off; I dropped the safety hook, that is an anchor attached under the coach; I had the brakes set; the purpose of the anchor-hook is to drop into some loops or links up and down the incline; it did not hold; whether the wheels were sliding or not I can't tell; they seemed to be moving; when we got down to the bottom the grip-car was turned over; I dropped the hook; it did not seem to grab hold; the second time it flew up the rail attached to this safety-hook where we hung it up, broke and struck me across the lip; I had hold of the brake and hung to it to the bottom of the hill; when I stepped off the coach and went around to the back end I noticed Mr. Feary assisting his sisters going toward the door. The platform is on a level at the depot; a good tight floor of heavy strong planks; there is a good slot-rail of iron there on each side of the slot; when this car went over, this iron rail and planks were torn up; the grip-car was pretty well torn up; the planks nor car were not torn up on top of the incline; I never noticed the speed until the woman hollered; that was what first attracted my attention. There was no jerk there, nothing unusual; we always have a little jar; I had hold of the brake when we got to the bottom and kept turning it on down the hill the best I could; I only let go of the brakes when I took hold of the woman who was screaming and I thought was about to jump off; I then tightened it up a little tighter; just as soon as I pushed those ladies back I dropped the hook; the car was going pretty fast when I pushed the ladies back; I did not know the train was loose until the woman jumped up; then I quieted

them before I dropped the hook; it was but a second; I could not have used the hook any sooner than I did because I did not discover it was loose; I applied the hook as quick as I could; the construction was such it would not do any good towards stopping the car; I could not see the wheels but they did not seem to be turning; I threw the brakes on the best I could; I know they did not hold the train; we rounded the curve to the right; the ladies were sitting with their faces to the gripman and they saw what happened and a gentleman jumped off; this occurrence caused them to scream and try to get away; the first I knew of it was their screaming; they were where they could see the grip and the gripman's actions with the grip; we met a car coming up the hill right at the top of the incline."

John Carter, witness for defendant, testified:

"Was division superintendent at the time of the accident; the western end of the line was at union depot at the foot of the incline; there was double track; I was in the office at Ninth and Washington; the cars had been running all that day on usual time, about twenty-seven trains an hour, from 5:40 in the morning; accident happened about 5:45 p. m.; I received a telephone message at Ninth and Washington; when I got down I found a grip car had run off the track, back through the floor and tipped over; I found the front shank of the grip broken; I have the broken shank (shows to the jury and explains the grip's construction and working); the car broke through the platform and tipped over; it broke the posts in the grip car and let the top of the car fall; I took the grip and shank to the shop at Ninth and Washington as soon as I got the wreck away; as I went up I examined the slot and found nothing in it; the car pitches over at Jefferson street; it is a regular grade from there down to the bottom; part of it is a viaduct when it pitches over at the brow of the hill; the grip leaves the rope about ten

inches off of the pulley; you can not let the cars down there without you have a good hold of the rope, the grade is so steep you could not hold them; I don't know when this appliance broke; there was none of the running appliances broke but this one shank; if the grip-shank breaks on the incline there is no way of stopping the car down the incline except to put the brakes on. The floor was torn up about twenty-five or fifteen feet after you rounded the curve there on the straight track right at the slot and also all the outside; it was pine plank torn out; the gripman could not get rid of the rope unless the shank breaks, except to unattach it and throw the lever over. The effect of the breaking of a grip-shank would be a crack and pop and jar of some kind. The breaking of a grip-shank would cause a pop; the hooks are intended to stop a train going down hill; if everything is all right the speed can be checked with the hook and loop a trifle; it can be checked a little if the speed is great; can check them any time; it helps to stop the car along with the brakes; if there had been anything in the slot to have broken the grip at the top of the incline I would have found it in the bottom of the conduit; I say the grip-shanking will let the rope out and the losing of the grip-handle and throwing down to the floor will have the same effect; if you throw the lever over it will throw the rope out; there was nothing to throw the dog out of the notches; we had no joints there or nothing else; there was a light load on this car; we run over with heavy loads, passengers hanging on the sides; the grip-shank takes these loads down and don't break; the rope is lifted eighteen inches at that point; there was chafing irons used on these grip-shanks to keep them from wearing so fast; there is none on this one; it is worn some; we could not keep the chafing irons on more than half a day, and quit using them."

Arthur Meyers, witness for defendant, testified:

"I was gripman on the car when it went down the hill the twenty-seventh of July, 1896, when Mr. Feary was a passenger; it got out of my control just at the brow of the hill at Jefferson and landed at the depot; at the bottom of the hill it jumped the track and turned over; I think there were eleven or twelve passengers on both cars; *the grip struck some obstruction in the conduit at Jefferson; the obstruction threw the grip over; it opened the grip and let the rope out;* I did not see the grip afterwards; nothing broken that I know of; I do not know whether any examination was made for obstruction in slot or not, I did not make any, I could not say there was any there; I applied the brakes; it did not seem to check the motion, I suppose the conductor was attending to his business on the rear end; the speed increased from the time it started; when the car turned over the plaintiff was under the rubbish, part of the rubbish was on him; I assisted in getting him out; there was this anchor and links on the incline to prevent the escape of cars in case of breakage on the hill; I don't know why it did not check it this time; the conductor was working that."

To this it is proper and necessary to add, that the defendant introduced testimony tending to show that "an examination of the conduit from the top to the bottom of the incline, made immediately after the accident, showed that there had been no obstruction in the conduit; that the brakes on the cars were in perfect working order; that after the accident the grip-shank was examined and found to be broken; that the grip-shank and appliances were the best known in use, and the particular one which broke had been in use but for ten days, running over the structure each day with perfect safety, and apparently was in perfect condition. It was in general use, having been purchased from a firm of the highest repute. Sometimes such shanks break without any apparent reason. The greatest strain on the shank is at the point where the car pitches over the brow

of the hill at Jefferson street. But, notwithstanding this, cars with like shanks, loaded with seventy-five or eighty passengers, constantly go over the incline in perfect safety. As directly contradictory to plaintiff's claim that the gripman lost the grip and tried to regain it, it appeared that had he lost it, as he started down the incline it would have dropped down eighteen inches, so that no effort of the gripman could have regained it, and for the gripman to lose the rope it would take all his force to throw the lever clear over and down to the floor, thus showing that a mere slipping out of his hands could not have that effect; a breaking of the shank would, however, lose the cable. Another indication that the shank broke at the brow of the hill was that the construction at the bottom of the incline was not sufficient to cause the breakage; that the grip-shank and appliances were the best and strongest in use, but that it is not possible to construct grip-shanks so that they do not sometimes break without apparent cause. No known appliance exists to stop a car on this incline if the grip is loosened from the cable. Cars running up and down in safety before and after the accident indicates that the incline structure was all right, and the way the car in this case got away indicates that the shank must have broken at the top of the incline, where there was the chief strain and much slack, which there is no known way to prevent. Since 1884 cars have every day run over the viaduct every two minutes and a half, from 6 a. m. till midnight. That the shank was carefully inspected and found to be in excellent condition on the morning of the accident. The appliances used for carrying the cars down the incline were the best that were ever invented, known or used."

The defendant also introduced evidence showing that at the trial the court appointed three disinterested physicians to examine the plaintiff, and they testified that there was nothing the matter with the plaintiff, but that he was shamming. Other

physicians and persons also testified to the same thing.    It was also shown that the plaintiff had said he did not work, because he had this case pending, and the railroad might have detectives watching him, who would find out that he was working. It was further shown that plaintiff attended all the parties, balls and fancy dress affairs in Kansas City after the accident. Testimony was also adduced that the plaintiff had claimed in 1893 to have fallen on a sidewalk, and to have received injuries similar to those claimed in this case, and that he claimed and collected benefits from an accident insurance company therefor.

The instructions complained of will be considered hereinafter.

## I.

The plaintiff's theory is that the gripman carelessly and negligently let the grip lever slip from his hands and in the same manner disconnected the lever from the cable, in consequence of which the car ran violently down the incline and caused the accident.    While on the other hand the defendant's theory is that the grip-shank broke as the car started down the incline at Jefferson street and in this manner the accident occurred; that the grip-shank was the best and most approved appliance of its kind, was new and had been in use only a few days; was apparently safe and sound; had been inspected on the morning of the day of the accident and found safe, and had safely carried the train down and up the incline several times that day, and was found broken immediately after the accident.

Thus, two diametrically opposite conditions were presented to the jury.    It was the province of the jury to decide, under the conflicting evidence, as to the facts.    The jury decided for the defendant.    There was substantial evidence to sup-

port a verdict either way.    This being true this court will not interfere with the finding of fact.    [James v. Ins. Co., 148 Mo. 1. c. 15-16.]

## II.

It is urged that the court excluded the testimony of three witnesses, offered in rebuttal, that the plaintiff did not appear to be in as good health after the accident as he did before. .

The plaintiff's condition, injuries and changed health were fully gone into by the plaintiff in chief.    The evidence offered was a part of plaintiff's case in chief, and did not constitute matter in rebuttal at all.    The trial court has a large discretion in such matters, but it should be wisely exercised, as it was in this instance, and that discretion will not be interfered with, except when clearly abused.    [State v. Smith, 80 Mo: 516; Roach v. Colbern, 76 Mo. 653.]    No excuse or reason was offered for not calling these three witnesses when the plaintiff's case in chief was presented. ,    There was no error in the action of the trial court in excluding their testimony when offered in rebuttal.

## III.

The court gave the instructions asked by the plaintiff, after modifying the first by inserting the words enclosed in brackets, "by the carelessness and negligence of defendant's servants, agents and employees," which (omitting that relating to the measure of damages, which cuts no figure on this appeal), were as follows:

"1.    The court instructs the jury that the defendant in this case was, at the time of the injury complained of, a carrier of passengers for hire in Kansas City, Missouri, and as such it was bound to provide reasonably safe track, roadbed and road-worthy cars and careful employees to manage the same

so far as practicable human skill, diligence and foresight could provide. And it is responsible for all injuries to passengers resulting from negligence on the part of its agents or servants. If, therefore, the jury believe from the evidence that on or about the twenty-seventh day of July, 1896, the plaintiff, George D. Feary, boarded one of defendant's cars on its line of road and paid his fare to be transported to defendant's depot at Union avenue in said Kansas City, and you further find that there is a descent in defendant's track or roadbed from a point near Jefferson street down to defendant's depot at Union avenue, and you further find and believe from the evidence that said train [by the carelessness and negligence of defendant's servants, agents and employees] got beyond the control of the servants of defendant and ran rapidly down said descent, and the car upon which plaintiff was a passenger left the track and was overturned and plaintiff was thereby injured without fault or negligence on his part, then it devolves upon defendant to prove to your satisfaction that the accident was caused by inevitable accident that could not have been detected or known to its agents or servants by the exercise of the utmost practicable human skill, diligence and foresight, and unless it is so shown, you should find for plaintiff.

"2. If the jury find and believe from the evidence that the plaintiff, George D. Feary, boarded one of the cars of defendant in Kansas City, Missouri, to be carried by it as a passenger from Washington street to its depot at Union avenue on or about the twenty-seventh day of July, 1896, and that said car and train was carelessly and negligently permitted to rapidly run down a descent on defendant's road with unusual speed and force, that the car was derailed and turned over and that plaintiff received injuries by reason thereof, without fault on his part, then the burden of proof is shifted upon the defendant to show to the satisfaction of the jury that the acci-

dent occurred through no fault, negligence, license or careless-
ness of defendant's agents, or servants, and unless it is so shown
the jury should find a verdict for plaintiff.

"3.   By the utmost practicable human skill,  diligence
and foresight, used in these instructions, is meant such skill,
diligence and foresight as is exercised by reasonably cautious
persons under like circumstances."

The modification of the first instruction is assigned as er-
ror.  And it is urged that in cases of injury to a passenger for
hire, the plaintiff, is only obliged to allege generally and prove
the relation of passenger and carrier and the injury, to make
out a prima facie case, and that the burden then shifts to
the carrier to exonerate himself.

This is true as a general proposition of law.   But in this
case the plaintiff did not plead this way.   On the contrary
he limited his right to recover to a specific act of negligence
of the defendant.   Hence, he could not avail himself of the
general rule.   The modification of the instruction simply fol-
lowed the issue tendered by the plaintiff and properly limited
his right to recover as he himself had  done.   [Waldhier v.
Railroad, 71 Mo. 514; Price v. Railroad, 72 Mo. 414; Ely v.
Railroad, 77 Mo. 34; Leslie v. Railroad, 88 Mo. 50; Yarnell
v. Railroad, 113 Mo. 570; Bunyan v. Railroad, 127 Mo. 12;
Hite v. Railroad, 130 Mo. 132; McManamee v. Railroad, 135
Mo. 440; Bartley v. Railroad, 148 Mo. 124.]

Moreover, no exception was taken or saved to the action
of the court in this regard, nor was the matter called to the
attention of the court in the motion for new trial.   It, there-
fore, is not open to review now.   [Baker v. Railroad, 122 Mo.
533; Hulett v. Nugent, 71 Mo. 131; Bartlett v. Veach, 128
Mo. 91.]

Furthermore it simply made instruction number one har-
monize with instruction number two asked by plaintiff,  and

Feary v. Metropolitan Street Railway Co.

given in exactly the terms asked.

There was no error in this ruling.

## IV.

The first instruction given for the defendant is objected to as being a mere "stump speech." It is as follows:

"The case should be considered by the jury the same as if it were a contest between two persons of equal standing in the community. The fact that one of the parties is a corporation should not affect your minds in any way, but the right of the parties should and must be determined upon the evidence introduced in the case and the instructions given to the jury, which is the law and only law to guide you in your deliberations. Those instructions, although read to you by the lawyers, are the court's instructions, and must be taken and considered by the jury the same if they had been read by the judge from the bench."

It is not claimed that it is not the law, but it is urged that it is improper to tell it to the jury in such phraseology.

In State v. Talbott, 73 Mo. 347, a somewhat similar instruction was given, and objected to. This court said: "The eighth instruction might have been omitted, but it correctly states the duty of the jury, and a state of public feeling may have existed which made it proper to declare to them their duty, and we can not see how, in any event, it could possibly have prejudiced the defendants."

So, here, it is not clear, and is not attempted to be pointed out, how "it could possibly have prejudiced" the plaintiff.

## V.

The defendant's second instruction is as follows:

Vol 162 mo—7

"Plaintiff claims to have lost earnings from his business by reason of his injuries. It matters not what loss there has been, if any, in the earnings of plaintiff unless that loss was directly caused by the necessary result of the injury received on July 27, 1896. If plaintiff could have earned money by reasonable effort and neglected so to do, he can not charge his loss, if any, to defendant."

It is argued that this is misleading, in that it tells the jury that if the plaintiff could have earned anything, however small, and did not do so, he can not recover anything from defendant.

The criticism is technical, and no jury would have put such a construction upon the instruction. It conveys, rather, the idea that the plaintiff can not recover from the defendant such an amount as he might have earned by reasonable effort, and did not do so. This is the law. But aside from this, the jury found that the plaintiff was not entitled to recover at all, and as this instruction only relates to the quantum of damages he may recover if the jury decide to return a verdict for him, and as the jury never got far enough to consider the amount of damages, it is clear that, even as construed by plaintiff, this instruction does not constitute reversible error in this case.

## VI.

The defendant's third instruction is:

"What the court says in the instructions read by plaintiff's counsel as to the burden being on defendant, does not mean that you are confined to the testimony offered by defendant in determining whether the burden has been established. You are to consider all the facts and circumstances in evidence, whether developed in the examination of plaintiff's or defendant's witnesses, and if you find therefrom that

there was no negligence of the character submitted, then the burden has been sustained by the defendant and it is entitled to the verdict, even though you find that Feary was a passenger and was injured without fault on his part."

It is objected to as being a criticism of plaintiff's instructions, and in conflict with plaintiff's instruction number two, and as failing to define the "character of negligence" submitted to the jury under the pleadings and evidence.

There is no conflict between this instruction and the second instruction given for the plaintiff.  The plaintiff's second instruction told the jury that the burden of proof was on him to show that the accident was caused by the negligence of the defendant, and if he so showed then the burden of proof shifted to the defendant to excuse itself.  This instruction simply tells the jury the means the defendant may employ to excuse itself, and directs what evidence the jury may consider in determining whether the defendant was without fault.

Such an instruction is proper.  [Noel v. Noel, 25 S. E. Rep. 242; Toponce v. Mill Co., 6 Utah 439; Foster v. Hall, 12 Pick. 89; Railroad v. Horst, 93 U. S. 201.]

## VII.

The fourth instruction given for defendant is:  "If the jury believe from the evidence that the injuries sustained by the plaintiff were merely the result of accident, then your verdict will be for defendant."

It is urged that it should have said "inevitable" or "unavoidable accident."

The same objection was urged to similar instructions in Sawyer v. Railroad, 37 Mo. 262, and in Henry v. Railroad, 113 Mo. 555, and in both cases the objection was held untenable.  In the last case cited, Burgess, J., said  "And we

think when used in this instruction, it was understood to mean that if the injury was purely accidental and without fault on the part of defendant's servant, it was not liable."

## VIII.

The defendant's fifth instruction confined the plaintiff's right to recover to the specific grounds embraced in the issues. What is said herein about the modification of the plaintiff's first instruction applies equally here.   There was no error.

## IX.

The defendant's sixth instruction is:

"Defendant is not required to prove what caused the train to get beyond the control of the trainmen; and even if the jury can not find from the evidence the exact cause, or if such cause is unknown and has not been shown, still if after considering all the testimony in the case, not only that offered by defendant but also that offered by plaintiff, you find that there was not any negligence on the part of defendant of the character submitted to your consideration, then the defendant must have the verdict, even though Feary was its passenger and received his injury without any fault upon his part."

The petition charged that the accident was caused by the defendant's negligence.   This instruction limits its responsibility to the act charged.   But if it did not, the defendant is not liable if it used the best machinery known, such as experience had shown was safe, such as the petition in this case alleged was safe if properly managed, and if the accident was caused by something that could not have been foreseen or guarded against.

In Tuttle v. R. R. Co., 48 Iowa 236, 239, 241, the court below charged, as counsel claim the law to be, i. e., in case of

derailment of a train, whereby a passenger was hurt, the burden was thereby placed upon the carrier to explain the cause of the accident. In rejecting the doctrine Judge Day said:

"We think this instruction was calculated to mislead the jury to the defendant's prejudice. It is true that where a dangerous accident occurs, which, under ordinary circumstances, would not have happened had the defendant and its employees exercised due care, prudence and watchfulness, proof of such an accident, with its attendant circumstances, raises a presumption of negligence, and the burden of proof is then cast upon the defendant to rebut this presumption. To this end defendant must show that in the selection and operation of the machinery which caused, or contributed to, the accident, it used due care, prudence, skill and watchfulness. This is as far as, upon any well recognized legal principle, the burden of proof can be cast upon the defendant, and is as far as any adjudication, to which we have been referred has gone, . . . . . . In this case, upon proof that the train uncoupled, a presumption may arise that there was negligence, either in the selection of the coupler or in the management of it, for it may be presumed that a coupler of approved pattern, properly managed, would not uncouple. Hence, proof of the fact of uncoupling may cast upon the defendant the burden of proving that the coupler was of a proper kind, and was carefully managed. If the instruction had not gone further than this it would not have been objectionable. But the court instructed the jury that, upon proof of such an occurrence, it devolved upon the defendant, not to prove that it exercised due care in the selection and operation of the coupler, but to satisfactorily explain the accident, and that, in the absence of such explanation, negligence will be presumed. In other words, when such an accident is proved to have occurred, the defendant can relieve itself from liability for the accident only by

furnishing a satisfactory explanation of it. Many accidents occur which are not susceptible of satisfactory explanation. An iron bridge which has, without apparent injury, sustained a heavy freight train, suddenly gives way under a much lighter passenger train. A train may pass over a road in safety one day, and the next, without any apparent cause, may be precipitated into the ditch. A car wheel of approved manufacture, and without any apparent flaw, suddenly breaks down. An old revolver, that has been knocked around for half a dozen years, and been snapped a hundred times, finally goes off and occasions death. These things are all inexplicable. And yet, under the doctrine announced in this instruction, a railroad company which could not satisfactorily explain why a bridge broke down, or a train jumped the track at a particular time, would lie under the imputation of negligence, notwithstanding it might show the exercise of the highest degree of care in the construction of the road, the bridge, and the operation of the train. The law, properly construed and administered, does not impose any such unreasonable condition."

In Pershing v. R. Co., 71 Iowa 561; s. c. 32 N. W. Rep. 488, 491, this case was approved, the court saying: "The holding that it was not required to give a satisfactory explanation of the cause of the breaking of the rail and bridge is supported by Tuttle v. Chicago, R. I. & P. Ry. Co., 48 Iowa 236."

In Eldridge v. R. R. Co., 32 Minn. 253, a case of derailment, the cause of the accident was not shown, the conductor testifying "that trains are often thrown from the track from causes that are not discoverable upon the most careful examination." In answer to the contention that there was liability if the cause was not shown, it was said: "Stress is laid upon the fact that the evidence fails to disclose the real cause of the accident; and it is insisted by the plaintiff that it devolves

upon the defendant, in order to exonerate itself from the charge of negligence, and to show that it exercised the highest degree of care consistent with the practical operation of the road, to disclose specifically to the jury the real cause of the accident, and thus make it appear that it was exempt from responsibility. This question relates rather, as we think, to the method of proof by which the result is to be reached. The evidence, as spread upon the record, may seem stronger or weaker according to the circumstances of each case. Yet, where it reasonably tends to establish the absence of such responsibility and liability on the part of the carrier, upon all the points in issue, it must be left to the jury to weigh, and their verdict exonerating the defendant, if fairly reached, must be presumed to include a finding of the real cause of the accident, or, if inexplicable, that the defendant was, nevertheless, exempt from negligence or culpability. [Brehm v. Great Western Ry. Co., 34 Barb. 271.]"

This instruction, therefore, is in line with the authorities cited and conforms to justice and common sense. There was no error in giving it.

X.

The defendant's seventh instruction is:

"If defendant's servants and employees exercised all the care and foresight that was reasonably practicable, then there was no negligence, and in determining any issue as to negligence on defendant's part submitted to you in these instructions, you are instructed that if there was exercised all the care that was reasonably practicable, then there was no negligence."

This instruction is claimed to be erroneous because the care and foresight required by it are such as is "reasonably

practicable," and it is insisted it should have exacted of the defendant the "utmost practicable human skill, diligence and foresight."

In Sullivan v. Railroad, 133 Mo. 1, the rule was stated to be that the carrier must use "the highest degree of practicable care and diligence which prudent men would observe in a like business, and under similar circumstances."

In Dougherty v. Railroad, 97 Mo. 647, the judgment for plaintiff was reversed because one of the instructions given for him required the defendant to use "the utmost human foresight, knowledge, skill and care" to prevent the accident.

In Gilson v. Railroad, 76 Mo. 282, in Smith v. Railroad, 108 Mo. 243, and in Schaefer v. Railroad, 128 Mo. 64, the use of the words "utmost care" was condemned. In Jackson v. Railroad, 118 Mo. 199, it was said the care required was such as "prudent men would use and exercise in a like business."

In Pershing v. Railroad, 71 Iowa 561, the use of the words "reasonable," "reasonably practicable" or "reasonably practical," was held not to lower the degree of care required of a carrier of passengers. [See also Railroad v. Canman, 52 Ark. 517.]

The instruction under consideration requires "all the care and foresight that was reasonably practicable." The law requires nothing that is unreasonable. If a carrier exercises the care so required there will be no injuries except in cases of inevitable or unavoidable accident or casualty. The instruction is as broad as the liability of the carrier should be made.

## XI

The defendant's eighth instruction is:

"Even though the plaintiff, Feary, was hurt without fault on his part, still under no circumstances can a verdict be

rendered against the defendant, unless the jury find that the train went down the incline by reason of the negligence of defendant's agents, servants and employees. If the car by reason of an unavoidable casualty got from the control of the gripman, then there was no negligence and your verdict must be for the defendant."

It is claimed that this instruction conflicts with plaintiff's instructions 1, 2, and 3, and that it assumes that there was an unavoidable casualty.

The instruction tersely states the respective theories of the plaintiff and defendant upon which the whole case was tried. The plaintiff limited himself to a right to recover to the negligence of the defendant. The defendant denied that it was negligent and contended that the injury was caused by unavoidable casualty.

The instruction only states in fewer words what plaintiff's instruction number one told the jury was the rule of law.

## XII.

The defendant's ninth instruction is:

"The plaintiff, Feary, was a witness in his own behalf: the jury are the sole judges of his credibility; all statements made by him, if any, which are against his own interest, must be taken as true; but his statements in his own favor are only to be given such credit as the jury under all the facts and circumstances in evidence deem them entitled to."

It is admitted that a similar instruction was held to be proper in a criminal case. [State v. Brooks, 99 Mo. 137.] But it is insisted that it is error to give it in a civil case. No good reason for such a distinction occurs to the legal mind. Admissions made in court, in the testimony of a party, have the same effect as if made in the pleadings, and admissions

in a pleading are taken as true for the purposes of the action. [Shirts v. Overjohn, 60 Mo. 308; Wright v. Town of Butler, 64 Mo. 165.] Statements against interest are called admissions in civil cases, and confessions in criminal ones. They are taken as true for the purposes of the case, because no man would make them if they were not true. If confessions are enough to hang a man or to send him to the penitentiary under the criminal statutes, it is hard to see why admissions should not be enough to conclude him in a civil suit. Greenleaf on Evidence (16 Ed.), sec. 170, says: "The rules of evidence are in both cases the same."

In Payne v. Railroad, 30 S. W. Rep. 150, speaking to a similar instruction, MACFARLANE, J., said: "He is conclusively bound by every declaration and admission against his interest made while testifying before the court and jury. [State v. Brooks, 99 Mo. 142, and cases cited.]"

## XIII.

A reversal is asked because of alleged misconduct of one of the jury during the trial. This matter is not open to review in this court. The matter complained of does not appear in the bill of exceptions. It is set up in the motion for new trial as a ground therefor, as follows: "Because the jury misbehaved, in that some of the members of the same played cards with one of defendant's attorney's during the progress of the trial." This is supported by affidavits filed with the motion for new trial, and is contradicted or explained by counter affidavits. But it is not part of the record. Merely copying the affidavits in the bill of exceptions does not make the matter part of the record. [Norris v. Whyte, 158 Mo. l. c. 33, and cases cited.]

But if it was properly in the record we would not be prepared to agree with the argument that a judgment should be reversed because a trial judge played a game of cards during adjournment with an attorney who was interested in a case on trial before the court, and the same principle applies to a juror. Lawyers and jurors generally reside in the same bailiwick, are acquainted with each other, meet frequently, during the term of court sometimes eat and sleep in the same tavern. The trial judge often does the same and sometimes he is the guest of an attorney who has cases before the court. But it never occurred to them, perhaps, that they were thereby laying the foundation for a reversal of their cases. It takes something more—some corrupt act, or act strongly pointing to positive turpitude to upset a verdict for misconduct. The acts here charged, even if done, are not regarded in this light by all men or by the law.

After this extended and detailed review of the case no reversible error has been found. The judgment of the circuit court is therefore affirmed. All concur; *Valliant, J.*, in the result, for reasons stated in separate concurring opinion.

### SEPARATE OPINION.

VALLIANT, J.—I concur in the result reached in this case for the reason that in my judgment there was no evidence that would have sustained a verdict for the plaintiff. The petition limited the negligence charged to that of defendant's servants in suffering the train to descend the incline at a dangerous speed. The only evidence attempted in support of that charge was that as the car pitched over the brow of the incline the gripman lost his grip. One witness said that the gripman turned his head and looked back and as he did so the grip-lever slipped out of his hand and fell heavily

forward.   When the end of the road was reached the grip-car fell over and it was then discovered that the grip-bar was broken.   If the grip-bar broke as the train pitched over the brow of the incline, which is most probable, it would naturally have jerked the lever out of the gripman's hand, however careful he may have been.   Under those circumstances there was nothing to indicate negligence on the gripman's part.   There was no pretense that there was any defect in the grip-bar which careful inspection could have discovered. The evidence showed that it was an accident, the cause of which is unknown and blame for which can be laid against no one.   Under this evidence, if the verdict had been for the plaintiff, the trial judge would not have hesitated to set it aside.

But there were two instructions given for defendant in this case, which in my opinion should not have been given.

I.   The fourth instruction for defendant was:   "If the jury believe from the evidence that the injuries sustained by the plaintiff were merely the result of accident, then your verdict will be for defendant."

If the plaintiff sustained injuries, upon the occasion in question, they were certainly "the result of accident," and they were "merely the result of an accident," and even if the accident had been brought about by the negligence of the defendant, still the injuries were "merely the result of accident."   It is argued in defense of this instruction that it means accident without fault on the part of defendant's servants. If the counsel who drew the instruction had intended to limit it to that meaning, apt words to that effect would naturally have been used.

In Henry v. Grand Ave. Ry. Co., 113 Mo. 525, an instruction like the one now under discussion was held not to be error.   But that case was like the case at bar in one important

respect, that is, the verdict was clearly for the right party, and the court was satisfied that the jury had not in fact been misled by the instruction. In commenting on another instruction in that case, which the court said was objectionable, the court, per Burgess, J., said: "We can not say that the jury was misled by it, as they found the only verdict they could have found consistent with the evidence. Appellate courts ought not to be too critical of the wording of an instruction if satisfied it was harmless in the given case and justice has been done. So in the case at bar, this judgment should not be reversed because this instruction was improperly worded, and liable to misconstruction. But on the other hand, we ought not to commend it as a precedent to be followed. There was no necessity for an instruction in such ambiguous terms. If it was intended to instruct the jury that the verdict should be for the defendant if they found that the plaintiff's injuries were the result of an accident without negligence on the part of defendant or of an accident the cause of which is unknown, it should have been so expressed. In the form in which it was given, it is liable to be misinterpreted and to mislead, and it should not have been so given.

II. Defendant's ninth instruction is: "The plaintiff Feary was a witness in his own behalf; the jury are the sole judges of his credibility; all statements made by him, if any, which are against his interest, must be taken as true; but his statements in his own favor are only to be given such credit as the jury under all the facts and circumstances in evidence deem them entitled to."

This instruction is inconsistent in its own terms. It first informs the jury that they are the sole judges of the credibility of the particular witness, and then undertakes to control them in that respect. It informs them, in effect, that whatever the witness may have said against his own interest,

whether casually or deliberately, lightly or solemnly, the jury must take as absolutely true, but they must beware of him when he speaks in his own behalf.

An instruction of this kind has upon several occasions been approved by this court in a criminal case, but it has never had the unanimous approval of the court.    In State v. Young, 99 Mo. 666, Judge Sherwood demonstrated that the giving of such an instruction is an invasion of the province of the jury and forbidden by law.    The jury are the sole judges of the credibility of the witnesses, and the court has no right to single out one and lay down rules for the jury to ascertain what weight they ought to give his evidence.    But the majority of the court held in that case that the instruction was right, and that decision seems to have been grounded on the statute which, while it removed the common-law disability of the accused and the husband and wife of the accused in a criminal case to testify in his or her behalf, provided "such facts may be shown for the purpose of affecting the credibility of such witness."    The learned judge, just mentioned, pointed out that that provision of the statute was only intended to allow the State to show in evidence that the witness was the husband or wife of the accused as a fact for their consideration, but it did not authorize the court to call that fact to the attention of the jury in an instruction and comment on it. The decision in that case has been followed in other criminal cases, and perhaps it is now to be regarded as settled.    But this is the first instance within my observation in which such an instruction has been before this court in a civil case, and whilst I am free to confess that I see no essential principle upon which it could be held inapplicable to a civil, if applicable to a criminal case, unless it be that the temptation to shield one's self or one's wife or husband by perjury from the consequences of conviction of crime, is greater than that under the in-

fluence of mere pecuniary interest, yet I am unwilling to sanction the extension of the field in which such an instruction may be used. The instruction was harmless in this case, but it should not be approved for a precedent.