McKINLEY C. MYERS v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant, and JOHN E. MYERS.

In Banc, December 20, 1922.

1. **INTERSTATE COMMERCE: Section Laborer: Burned in Setting Fire-Guard.** It cannot be held as a matter of law that a plaintiff whose usual employment was that of a section laborer engaged in the repair of the railroad track, was engaged in interstate commerce at the time he was burned, if at that time he was not at work on the railroad right-of-way, but solely on the premises of an adjoining landowner, in setting out a fire-guard to prevent the spreading of fire from passing engines to the landowner's hay and other property, although he was performing said work in obedience to the orders of the company's foreman, and said order was given in an attempt to save the company from liability under a state statute making it responsible for damages to every person whose property may have been injured or destroyed by fire communicated by its locomotive engines. Notwithstanding said statute, if at the time said laborer was injured he was not at work upon the right-of-way, but was at work on the adjoining property and engaged solely in setting a fire-guard to prevent the spreading of fire from engines that might later pass to the properties of adjoining proprietors, he was not engaged in interstate commerce, although immediately before said fire-guard was set he and his associates were engaged in repairing the track, and their usual course, after the fire on the adjoining property was extinguished, was to return to their labor in repairing the track.

2. ———: ———: ———: **Conflicting Evidence.** Where the evidence is conflicting on the point whether at the time the section laborer was burned he was at work on the railroad right-of-way or on the land of an adjoining owner, in setting out a fire-guard to prevent the spreading of fire from passing locomotive engines of interstate

trains to near-by hay stacks and other property, the question whether he was at the very time of his injury engaged in interstate commerce is for the jury to decide, under proper instructions, and not for the court to determine as a matter of law.

3. ———: ———: ———: **Statute.** The statute (Sec. 9954, R. S. 1919) making a railroad corporation responsible in damages to every person whose property may be injured or destroyed by fire communicated by locomotive engines in use upon its railroad is a proper police regulation, but it was not enacted to protect the railroad's right-of-way, or any structure upon it, but to protect adjoining properties; and the fact that the possible destruction of stacks of hay on an adjoining farm would impose liability upon the company, which a section laborer at the time he was burned was attempting to prevent by putting out a fire-guard on such farm, is not sufficient to make his work interstate commerce. The burning of the hay stacks would in no way interfere with the operation of trains on the track, whether intrastate or interstate.

4. **NEGLIGENCE: Leaking Bucket: Oil on Trousers.** Positive evidence by one witness that the bucket, which plaintiff carried on the day that he was burned while engaged in putting out a fire-guard on a farm adjoining the railroad right-of-way, was leaking, and had leaked for some days before; that there was coal oil in the bucket, and he saw coal oil on plaintiff's trousers just prior to his injury, and the circumstantial evidence that flames suddenly flashed up on plaintiff's trousers while he was fighting the fire, making a volume of black smoke like the burning of coal oil, is abundant evidence to carry plaintiff's case to the jury on the question whether the railroad company, whose foreman had handed the bucket to him and directed him to use it in setting out a fire-guard, was negligent in furnishing a leaking bucket.

5. ———: **Minor: Contributory: Matter of Law.** The court cannot say as a matter of law that a plaintiff thirteen or fourteen years of age at the time he was injured was in all respects to be regarded as an adult in passing upon the question of his contributory negligence, and therefore it is proper to refuse an instruction asked by defendant telling the jury to entirely disregard the fact that plaintiff was a minor at the time he was injured.

6. ———: **Cautionary Instruction: That Defendant Is Corporation.** The refusal of a cautionary instruction telling the jury to decide the case according to the evidence and the instructions, regardless of the fact that one of the parties is a corporation and the other an individual, is not reversible error.

Myers v. C. B. & Q. Railroad Co.

7. ———: Predicated Facts: Included in Other Given Instructions. It is not error to refuse an instruction telling the jury that if plaintiff's burns were caused by the work he was doing, and not by the negligence of defendant, their verdict must be for defendant, where such predicates were, in substance, embraced in other instructions given both for plaintiff and defendant.

8. ———: Assumption of Disputed Fact. It was not error to refuse an instruction telling the jury that if plaintiff "caused the coal oil to drip or drop out of the bucket when he jerked the cobs out of the bucket" and did not exercise ordinary care and such lack of care contributed to his injury, he could not recover, where his testimony was to the effect both that he "would just jerk the cobs out" and that he would "just lift them out" or "took them out," since the instruction told the jury that plaintiff "jerked the cobs out of the bucket" and the jury might have inferred from his testimony that he "just took them out."

9. ———: Instructions: Reference to Others. The instructions given must be read together, and an instruction telling the jury that if defendant was "negligent, as defined in these instructions, in directing plaintiff to engage in working in and about the fire with an appliance handed him by the foreman," is not error when read in connection with another given instruction pointing out "the appliance" as a bucket containing coal oil.

10. ———: ———: Conflicting with Correct Instruction Given: Age of Plaintiff. Where plaintiff was but thirteen or fourteen years of age at the time he was burned in trying to prevent the further spread of a fire-guard, and not shown to have had much previous experience in fighting fires, it is not error to give an instruction for him requiring the jury to consider his age, capacity and experience in determining whether he exercised ordinary care for his own safety. And since the giving of said instruction was not error, the refusal of instructions asked by defendant which conflicted therewith in this regard, in that they omitted to refer to his age, capacity and experience, was not error.

11. ———: ———: ———: Knowledge of Defendant. Evidence that the bucket, containing coal oil and handed to plaintiff by defendant's foreman, with directions to use it in putting out a fire-guard, leaked before it was handed to him and had leaked for some time on previous days, and that coal oil was seen on plaintiff's trousers just before his injury, was sufficient to warrant the jury in finding that the foreman knew, or could have known by the exercise of due care, that plaintiff's trousers were saturated with coal oil from the leaking bucket prior to his injury, and authorized the

296 Mo.—16

refusal of an instruction for defendant telling the jury that there was no evidence that the foreman knew before the injury, or by the exercise of care could have known, that plaintiff's trousers were saturated with coal oil.

12. ———: ———: Past Medical Attention. An instruction telling the jury to take into consideration, in assessing plaintiff's damages, "the reasonable value of the medical attention and nursing which said injuries are reasonably certain to occasion in the future" does not permit a recovery for medical attention and nursing already rendered.

13. ———: Excessive Verdict: $20,000: Incurable Burns. Plaintiff, a section laborer on a railroad, weighing about 150 pounds, though at the time less than fourteen years of age, was so badly burned about his leg and foot that about one-eighth of his body is covered with scar-tissue, which no longer functions as healthy skin; a large ulcerated sore eight inches long and two inches wide formed on the upper part of the leg, and at the trial four years later this ulcer had increased in depth; scar-tissue imposes heavier duties on the kidneys and healthy skin, and he has Bright's disease, which may have been caused from the burns; he is nervous, confused in his mind, was confined to his bed for six months, cannot sleep, and has done no work for four years; and his injuries are incurable, though experts testified that they might substantially heal, especially if new skin were grafted onto the scarred parts. *Held*, that a verdict for twenty thousand dollars is not so excessive that the court can say, all the facts and circumstances being considered. that the jury did not fairly weigh the evidence of his injuries, both as to their character and effect, or that it would be justified in interfering with the amount.

Appeal from Lafayette Circuit Court.—*Hon Samuel Davis*, Judge.

AFFIRMED.

*H. J. Nelson, Lyons & Ristine* and *J. G. Trimble* for appellant.

(1) The peremptory instruction to find for defendant should have been given, for the reason that both plaintiff and defendant railroad company were engaged in interstate commerce and plaintiff's cause of action, if any he had, was barred by the limitation contained in

the Federal Employers' Liability Act; no negligence was shown and the injury resulted from an assumed risk. (a) The railroad company was engaged in interstate commerce. All trains over the line at the place of accident were interstate trains carrying interstate passengers and freight. Sec. 1, Interstate Commerce Act, 3 U. S. S. A. 30. (b) Plaintiff was engaged in interstate commerce. Sou. Pac. Co. v. Ind. Comm. of California, 174 Cal. 8; P. & R. Ry. v. DiDonato, 41 U. S. Sup. Ct. Rep. 516; Reap v. Hines, 273 Fed. 88; Manes v. Railway, 220 S. W. 14; Sou. Pac. v. Puckett, 244 U. S. 571; Erie R. Co. v. Azary, 40 S. C. 454; Gloucester Ferry Co. v. Penn., 114 U. S. 196; Coal & Coke Ry. v. Deal, 231 Fed. 604; Erie Ry. v. Collins, 40 S. C. 450; Shanks v. Railroad, 239 U. S. 556; N. Y. Central Railroad v. White, 243 U. S. 188; San Pedro Railroad v. Davide, 210 Fed. 870; Sanders v. Railroad, 97 S. C. 50; Louisville Railroad v. Walker's Admr., 162 Ky. 209. 172 S. W. 517; S. A. L. Railroad Co. v. Padgett, 236 U. S. 668; N. Y. Central Railroad Co. v. Carr, 238 U. S. 260; N. C. Railroad Co. v. Zachary, 232 U. S. 248. As a section man plaintiff was engaged in interstate commerce. San Pedro Railroad v. Davide, 210 Fed. 870; Central Railroad v. Colasurdo, 192 Fed. 901; Zikos v. Oregon R. & N. Co., 179 Fed. 893; Lombardo v. Boston Railroad, 223 Fed. 427. An employee "on duty" though not at the time at work, is engaged in interstate commerce. N. C. Railroad Co. v. Zachary, 232 U. S. 248. He is "on duty" when "subject to call." M. K. & T. Ry. v. United States, 231 U. S. 112; United States v. K. C. S. Ry., 189 Fed. 471; United States v. D. & R. G. Railroad, 197 Fed. 629. (c) The injury resulted from a risk incident to the work and was assumed by plaintiff. T. & P. Railroad v. White, 177 S. W. 1185. (d) Plaintiff's action, if any he had, was barred by the limitation contained in the Federal Employers' Liability Act. Emp. Liability Act. sec. 6, 2 U. S. A. 469; Vaught v. Virginia Railroad, 179 S. W. 314. (e) There

was no evidence of negligence in the furnishing of the bucket and no evidence that if the bucket were leaky plaintiff's trousers became saturated with oil because thereof. He "jerked" the cobs out of the oil. As between employer and employee under the Federal Employers' Liability Act there is no such thing as *res ipsa loquitur*. There must be actual proof of negligence. Negligence cannot be inferred. Midland Valley v. Fulgham, 181 Fed. 91; C. & N. W. Railroad v. O'Brien, 132 Fed. 593; Northern Pacific v. Dixon, 139 Fed. 737; Nelson v. N. P. Ry., 148 Pac. 388; Fish v. Railway, 263 Mo. 106; Patton v. Railroad, 179 U. S. 658. There was no proof of negligence in selecting the bucket which would permit the case to be submitted, even under the state law. (2) Defendant's refused Instructions B, C, D, E and F should have been given. (a) Instruction B should have been given for the reason that the testimony showed plaintiff to be of sufficient age, intelligence and experience in the work to be treated as an adult. Payne v. Railroad, 129 Mo. 405; Frauenthal v. Gas Co., 67 Mo. App. 1; Butz v. Cavanaugh, 137 Mo. 503; McGee v. Railroad, 214 Mo. 530; Spillane v. Railroad, 135 Mo. 414. (b) Instruction C should have been given for the reason that there was no evidence of negligence in furnishing the bucket and no evidence that any oil "leaked" from the bucket to plaintiff's trousers. (c) Instruction D was a cautionary instruction and should have been given. (d) Instruction E should have been given because it told the jury that if his injury was brought about by the work which he was doing and not because of negligence on the part of the defendant, plaintiff could not recover. The risk was an assumed one. T. & P. Railroad v. White, 177 S. W. 1185. (e) Defendant's refused Instruction F should have been given for the reason that plaintiff testified that he just jerked the cobs out of the bucket. If his conduct in jerking the cobs out of the bucket caused his trousers to become saturated with coal oil, it was his own act and not the

result of a negligent furnishing of a leaky bucket.  Grand
Trunk Ry. v. Lindsay, 233 U. S. 42; Ellis v. Railroad,
155 Ky. 745; Fletcher v. Railroad, 155 N. W. 3.   (3)
Plaintiff's given Instructions 1, 3 and 5 are erroneous,
(a)   Plaintiff's Instruction 1 is in conflict with defend-
ant's given Instruction 1, in that it submits for the con-
sideration of the jury the question of negligence "in
directing and commanding plaintiff" to engage in work-
ing about the fire, while defendant's Instruction 1 tells
the jury there was no evidence of negligence in that re-
gard.  It is in conflict with defendant's Instructions 5,
6, 8, 9 and 12, in that it submits for the consideration of
the jury plaintiff's age, experience and capacity.   It
is not confined to the negligence pleaded.  It permits a
recovery if the foreman negligently directed plaintiff to
engage in working about the fire with an appliance
handed him by the foreman.  The only appliance "hand-
ed him by the foreman" was a rag.  There is no claim
that the rag was a defective appliance.  Instructions
must be within the pleadings and the evidence.  Hufft
v. Railroad, 222 Mo. 286; Degonia v. Railroad, 224 Mo.
564.  It does not define the negligence which would per-
mit a recovery, but leaves the jury to imagine and de-
termine for themselves the act of negligence, regardless
of whether such act was pleaded or proven by compe-
tent evidence.  "Instructions must be within the pur-
view both of the pleadings and the evidence."  Degonia
v. Railroad, 224 Mo. 589.  It submits for the considera-
tion of the jury plaintiff's age, experience and capacity,
there being no evidence to justify such an instruction.
It permits a recovery if plaintiff were burned while work-
ing in obedience to a command of his father, regardless
of whether there was any negligence on the part of the
father and regardless of how he came in contact with
the flames.  (b)   Plaintiff's Instruction 3 is in conflict
with defendant's Instruction 1, in that it permits the
jury to find that his father negligently ordered plaintiff
to engage in fighting fire, while defendant's Instruction

1 tells the jury there was no evidence that he was negligently ordered to engage in fighting fire. It is in conflict with defendant's Instruction 3, in that it permits the jury to find that his father knew or could have known plaintiff's trousers were saturated with coal oil, while defendant's Instruction 3 tells the jury there was no evidence that the defendant knew or by the exercise of reasonable care could have known plaintiff's trousers were saturated with coal oil. It permits the jury to find that his father could have known of the leaky bucket instead of requiring the jury to find that he did know. Negligence must be proved, not inferred. Midland Valley v. Fulgham, 181 Fed. 91; Patton v. Railroad, 179 U. S. 658. There was no evidence that the bucket was not reasonably safe for the purpose for which it was used. There is no evidence that plaintiff was ordered to use the bucket as it is claimed he did use it. There is no evidence that coal oil "leaked" from the bucket upon plaintiff's trousers. It ignores all the evidence in the case showing the purpose for which a fireguard was being burned. The fireguard was being burned to protect bridges and prevent delays to and wrecks of trains, as well as to protect property of adjacent landowners so as to save money to the company. This instruction limits the purpose to that at the moment plaintiff was injured. This instruction ignores the fact that the apparent danger of the spreading was occasioned by a "suck" or whirlwind. The instruction to "help the boys" to keep it from spreading was given after plaintiff had voluntarily started "back to help." He was not "ordered" to help. (c) Plaintiff's instruction 5 is erroneous. It permits a recovery for medical attention and nursing "in the future." In the connection in which it is used the words mean from the time of his injury July 12, 1911, six years before he became of age. If there could be a recovery for medical attention and wages during that time his father would be entitled to such recovery. L. & N. Railroad Co. v. Long, 189

S. W. 435.  It permits a recovery for wages, medical attention and nursing in face of the fact that his father's negligence (if there were any negligence in the case) was the cause of plaintiff's injury, and the father could not recover a judgment because of his own negligence.  It assumes plaintiff is unable to earn a living, while the evidence shows there is no total disability and no impaired ability except through his own failure to use proper means to effect a cure.  Permitting recovery for total disability when plaintiff's ability is only impaired is erroneous.

*Duvall & Boyd* and *Kelly, Buchholz, Kimbrell & O'Donnell* for respondent.

(1)  The petition having alleged and the answer having admitted, and the evidence of the witnesses of both parties who were present at the time of the injury having shown, that the purpose of the work in which plaintiff was engaged at the very time of his injury was to prevent the burning of the property of a farmer beside the right of way so as to relieve defendant from the liability imposed on it by Section 9954, the trial court could not have given defendant's peremptory instruction upon the ground that at the time of plaintiff's injury he was engaged in interstate commerce.  In the Matter of Plass v. C. & N. E. Ry. Co., 221 N. Y. 472, 226 N. Y. 449; Railway Co. v. Chojnacky, 163 S. W. 1011.  (2)  Defendant abandoned its contention at the conclusion of the evidence that there was an issue to submit to the jury concerning the question of interstate commerce, and at its request the trial judge submitted the cause to the jury upon the theory that the laws of the State of Missouri with reference to contributory negligence (see defendant's Instructions 6 and 9) constituted a complete defense to the action, and defendant cannot now be heard to urge that the case was governed by the Federal Employers' Liability Act, un-

der the rule that the cause must be disposed of on appeal upon the same theory as the parties assumed at the trial. Meyers Drug Co. v. Bybee, 179 Mo. 354; McDonald v. Building Assn., 175 Mo. 250. (a) Defendant's peremptory Instruction A at the close of all the evidence made no reference to the Employers' Liability Act. No other instruction asked by the defendant referred to said act, but the defendant's instructions numbered 6 and 9 and its refused Instruction F demonstrated that it asked the court to submit the case to the jury on the theory that the laws of the State of Missouri governed its liability, and it now cannot have the case disposed of in this court on a different theory. (b) The instructions asked by both parties and given by the court constitute the one test by which the appellate courts determine the trial theories of litigants. Mitchell v. Rys. Co., 125 Mo. App. 1. (3) The physical fact that plaintiff and his fellow employees' were engaged in burning a fire guard outside the right of way and that the purpose of the work was to prevent fire from destroying hay stacks, and that the right of way was not being burned except when the fire from the fire guard casually escaped therefrom, in connection with the testimony of all of the witnesses for both the plaintiff and the defendant, who were actually engaged in the work at the time and who actually knew what the purpose of the work was, demonstrated that the conclusions or opinions of witnesses, placed on the stand by the defendant, to the effect that the purpose of burning a fire guard, in addition to protecting landowners' property along the right of way, is also to protect fences, telegraph poles, trestles, bridges and railroad ties, has no probative force, for the reason that the uncontradicted evidence of both parties with reference to this particular fireguard and the said physical facts disclose that the only purpose was to protect the hay stacks mentioned in evidence and thereby relieve the defendant from the liability imposed by Sec. 9954, R. S. 1919. Payne

v. Railway, 136 Mo. 575; Weltmer v. Bishop, 171 Mo.
116; State v. Nelson, 118 Mo. 126; Waggoner v. Rail-
way, 152 Mo. App. 173; State v. Pollard, 139 Mo. 220;
State v. Hamilton, 170 Mo. 377; State v. Vaughn, 200
Mo. 122; State v. King, 203 Mo. 560; State v. Arnold,
206 Mo. 589; Artz v. Railway, 34 Iowa, 153; McLeod
v. Railway, 125 Iowa, 270. (a) Even if the right of
way were being burned and there was no testimony as
to the purpose of the work, excepting testimony of
railroad officials to the effect that the purpose included
the protection of property of landowners and instru-
mentalities of the road used in interstate commerce, yet
the court could not, as a matter of law, accept such tes-
timony as true, but should have submitted the question
to the jury. In the Matter of Plass v. Railway, 221 N.
Y. 472, 226 N. Y. 449. (4) In order to defeat recovery
by an injured employee on the ground that at the time
of receiving his injuries such employee was engaged in
interstate commerce, it is not enough to merely show
that the railroad company for which he was working
was at that time engaged in such commerce, but one
seeking to establish such defense must go further and
show that the employee himself was at such time en-
gaged in interstate commerce. Robert's Federal Lia-
bility of Carriers, sec. 449, p. 776, and sec. 466, p. 808;
Zavitovsky v. S. M. & St. P. Railroad Co., 161 Wis. 461.
(a) And until the contrary is shown it will be pre-
sumed that an action for injuries to a railroad em-
ployee, through the negligence of his employer in the
use or operation of defendant's railway within the State,
that he was not engaged in interstate commerce, and that
he is seeking a remedy under the laws of the State.
Roberts' Federal Liability of Carriers, sec. 453; Os-
borne v. Gray, 241 U. S. 16. (b) The plaintiff was not,
at the time of receiving the injuries sued for in this
case, engaged in interstate commerce within the mean-
ing of the Federal Employers' Liability Act. The test
of such employment is: Was the employee, at the time

of the receipt by him of the injuries sued for, engaged in interstate commerce, or in an act so directly and immediately connected with such commerce as substantially to form a part or a necessary incident thereof? Clearly the plaintiff in this case does not come within that test. Robert's Federal Liability of Carriers, sec. 451, p. 778; C. B. & Q. Railroad Co. v. Harrington, 241 U. S. 177; Shanks v. Delaware, L. & W. R. Co., 239 U. S. 556; Illinois Central R. Co. v. Behrens, 233 U. S. 473; N. Y. Central Railroad Co. v. Carr, 238 U. S. 260; Southern Ry. Co. v. Pitchford, 253 Fed. 736. (c) It will not do in this case to say that, because plaintiff was engaged in interstate commerce within the meaning of the Federal Employers' Liability Act at such times as he was working upon the railroad track of the defendant railroad company, he was engaged in interstate commerce at the time of receiving his injury; for the nature of an employee's work at the very time of receiving an injury is the test in determining whether his rights and the liability of the defendant are governed by the Federal statute or by State laws. Roberts' Federal Liability of Carriers, sec. 454, p. 782; Illinois Central Railroad Co. v. Cousins, 241 U. S. 641; C. B. & Q. Railroad Co. v. Harrington, 241 U. S. 177; Shanks v. Delaware, L. &. W. Railroad Co., 239 U. S. 556; N. Y. Central Railroad v. Carr, 238 U. S. 260; Erie Railroad Co. v. Welsh, 242 U. S. 303; Minneapolis-St. L. Railroad Co. v. Winters, 243 U. S. 353; Illinois Central Railroad Co. v. Behrens, 233 U. S. 473; Delaware, Lack. & West. Railroad v. Yurkonis, 238 U. S. 439; Southern Ry. Co. v. Pitchford, 253 Fed. 736. (d) The mere fact that the act in which the employee is engaged at the time he receives his injuries, may or will eliminate some of the inconveniences and possible expenses in the operation of an interstate railroad, does not show that the employee was at such time engaged in such commerce. Jackson v. Railway Co., 210 Fed. 495. (e) Where, under all the evidence in the case, any essen-

tial matter bearing on the question whether the employee was, at the time of the injury, engaged in interstate commerce, is in doubt, the question should be submitted to the jury under proper instructions as was done in this case. Roberts' Federal Liability of Carriers, sec. 461, p. 798; North Carolina Railroad Co. v. Zachary, 232 U. S. 248. (5) This action is prosecuted under the laws of the State of Missouri and negligence having been proven on the part of the railroad company and its codefendant, there can be no assumption of risk in the case, but the question resolves itself into one of contributory negligence, and unless the danger of performing the work, in which the plaintiff was engaged at the time of receiving his injury, was so glaring that a person of the then age, intelligence, capacity and experience of plaintiff would not have undertaken to do the work, the plaintiff cannot be denied a recovery. Bradley v. Ry. Co., 138 Mo. 293. (a) Since the defendant was negligent the plaintiff could not be held to have assumed the risk of the defendant's negligence under the law of Missouri. Curtis v. McNair, 173 Mo. 270. (b) As this case was not governed by Federal law, the rule with reference to assumption of risk announced in Pryor v. Williams, 254 U. S. 43, does not apply, or change the Missouri rule. (c) There was direct evidence of negligence in furnishing the bucket for plaintiff's use in performing the work of setting fireguards, and direct evidence that such bucket leaked and saturated plaintiff's trousers with coal oil. (d) And there was other evidence from which the jury might reasonably infer that plaintiff's trousers had become saturated with coal oil. (e) If there is any substantial evidence supporting the pleaded acts of negligence, a case should be submitted to the jury. Patrum v. Railroad, 259 Mo. 124. (f) The Missouri law with reference to negligence in furnishing defective tools governs this case. Williams v. Pryor, 272 Mo. 613. (6) This instruction properly submits for the consideration of

the jury the plaintiff's age, intelligence, capacity and experience. Those facts were particularly for the consideration of the jury in this case. Jackson v. Butler, 249 Mo. 342; Moeller v. United Railways Co., 242 Mo. 721. (7) Considering the severe and permanent nature of the injuries sustained by plaintiff, the verdict in this case cannot be said to be excessive, but, on the contrary, is conservative, and the claim of counsel for appellant that the motion for a new trial should have been sustained for that reason is wholly unfounded. Meeker v. Union Electric Light & Power Co., 216 S. W. 933.

SMALL, C.—Personal injury suit. On July 12, 1911, plaintiff, with his father, John E. Myers, lived at Browning, Linn County, Missouri. He was fourteen years old on the 23rd day of October following. He was working for the defendant railroad company as a section hand under his father who was foreman of the crew. On that day in the afternoon, in attempting to prevent the spread of fire from a fireguard which he and other members of the crew were engaged in burning in a meadow adjacent to defendant's right-of-way, his clothing caught fire and he was severely burned.

The petition in the suit before us was filed October 10, 1919, and alleged that plaintiff was ordered by defendant railroad company "to burn the grass and combustible substances adjacent to said right-of-way for the purpose of preventing liability against said defendant railroad company from accruing by reason of damage to property of persons or corporations resulting from injury or destruction of such property by fire communicated directly or indirectly by locomotive engines in use upon said railroad owned and operated by said defendant corporation." Among other specifications of negligence the said petition charged: "That defendants furnished plaintiff with a defective bucket, which appliance was not reasonably safe so as to enable the plaintiff to perform said work with reasonable safety

to himself, which appliance was a leaky bucket containing a highly inflammable substance known as coal oil, which coal oil dripped from said bucket upon plaintiff's trousers while he was engaged in obedience to defendants' orders in burning said fireguards, and thereafter notwithstanding defendants knew or by the exercise of ordinary care could have known that plaintiff's said trousers were so saturated with said coal oil, said defendants ordered and directed plaintiff to engage in fighting fire which theretofore had been set out so as to prevent the spread of the same to certain hay stacks located on the lands of a landowner adjacent to said right-of-way,'' whereby plaintiff, without fault on his part, was seriously burned, etc.

Defendant John E. Myers made default.

The answer of defendant railroad company put the allegations of the petition in issue. Alleged that defendants' railroad extended from the towns of Carrollton and Laclede in the State of Missouri to the city of Centerville, in the State of Iowa, and that all trains, freight and passenger, running through Browning, Missouri, were interstate trains; that defendants' locomotives emitted sparks which would ignite combustible matter on and adjacent to its right-of-way, and that it was necessary to burn such material for a distance of 100 feet from its track within and without its right-of-way, in the operation of its interstate line, to facilitate and prevent undue burden upon interstate commerce; that unless such vegetation along its track was so destroyed said sparks from said engines would destroy property on adjoining lands to the value of thousands of dollars, and thus cast upon interstate commerce a great burden, and the lives of passengers on its interstate trains would be endangered, and interstate commerce interfered with by the destruction of its bridges, fences and telegraph poles; that plaintiff was injured while burning such vegetation and was then and there engaged in interstate commerce; that his said injuries occurred more than two

years before filing this suit, and his cause of action was barred by the Statute of Limitations applicable thereto. The answer further pleaded contributory negligence and assumption of risk.

The reply was a general denial.

Prior to instituting the suit before us, plaintiff had brought three other suits, and in the first two the petition alleged in effect that when he was injured he was engaged in burning off the right-of-way of defendant to protect its property and that of adjoining owners from injury by fire, and in the third, that plaintiff was assisting in burning fireguards on the outside of the right-of-way for the purpose of preventing the spread of fire from its right-of-way to adjacent lands and from adjacent lands to its right-of-way. There was no charge of negligence in furnishing a leaky bucket in the first petition, but such charge was contained in the subsequent petitions. These petitions were all read in evidence by defendant railroad.

In this case, plaintiff, on his own behalf, testified in substance, as follows:

We had worked on the track up until noon that day; there were six or seven in the bunch; John E. Myers (father) was foreman. He said he was going to burn fireguards that evening. That morning we had worked on the track just north of Browning. He (John E. Myers) said he had instructions to do so "and had to protect the company's or adjoining people's property, and to get at it at once and get it done." It was a dry season. We went to work at one o'clock that afternoon burning these fireguards in a hay field outside and about fifty feet from the right-of-way fence. We burned a space about fifty feet wide in the meadow. He (John E. Myers) said he would have to make it that wide to keep any sparks from going over. He wanted to protect some hay in the meadow; it was about a hundred yards from the right-of-way, in stacks. We were burning the fireguard about a hundred feet from

the railroad track. Well, he (John E. Myers) told us he wanted to burn a fireguard and wanted to protect these hay stacks. He had a bucket of coal oil and some cobs in it. The cobs had a wire about three or four feet long stuck into their ends, and somebody would light the cob and start out with it and drag it along with the bucket in his hand and set the fire. The foreman gave us instructions not to let it (the fire) get away if we could possibly help it. A. E. Austin first used the bucket and set out the fire. I got a rag to fight with (to keep the fire from spreading beyond the intended limits); I got so hot fighting I was advised to set fire instead of fighting, which I did when this man let me have the bucket, cobs and wire. John E. Myers told him to. I set the fire out about fifty feet from the fence and these men were to stop it when it got wide enough, not to let it get away any further. It was a gallon bucket. After I set quite a strip on fire the foreman said, Don't set any more; he said, "Quit setting out," and, "Boys, don't let it get away." He told me to quit setting and set the bucket away, and I set it on a fence post; followed his directions. I started back to help fight the fire; he said not to let it get away. He handed me a rag, an old pair of overalls, which was betwixt wet and dry. I fought the fire with it; I tried not to let it get away. I was fighting when I noticed I was afire. "Q. Now this bucket that you used in setting out fire, had it leaked on your trousers? A. Well, I dont know." Don't know what caused me to catch fire. The flame flashed up all at once in my face before I could get to my legs, before I could fight it. I burned my fingers along there (indicating), and began to scream and holler. "Q. How did the blaze flash up as compared to how coal oil will flash up? A. Well, it all come up at once around my waist before I knew it—seemed like the wind was hitting it hard and burning fast." It made me excited to keep out of it, and I was screaming and making a noise. It burned fast, and the blaze of

the smoke was black and just puffing. Don't know how long that bucket had been on the place. The blaze spread all over my face; it seemed like my tongue was dry and my throat. Somebody throwed me down. My father began to holler to help me. They just jumped into me and pulled my clothes off. A man came along in a buggy, and they took me home. My left leg from the sole of my foot up to the hips was burned and sore; my heel was burned and sore for a long time; my whole left leg was burned, just wouldn't heal some way. I lay there on the davenport, and people seen me and said, Get a doctor, and someone said, There wasn't a doctor in town, and a young man got some linseed oil, which he said he had heard was good and he poured that all over me. My right leg was also burned, about half way from the knee to the ankle, on the inside, for a space about the size of both my hands, but not so bad as the other; the skin rolled up and pealed off. But my left leg seemed to be raw all over from my ankle to my hip and on both hips. My back even was hot, and my back bone seemed to be sore there; both of my hands were burned, but I have recovered from that. It seemed like my throat—I couldn't drink enough water to take the burn out of it. It was about six months before I was out of bed. I had to lay flat on my back, and they tied my arms so that I wouldn't tear this leg open in my sleep. Kept my left foot on a pillow about a foot high over the bed. I would be doctored twice a day during that time, just laying there—screaming and yelling, I was so bad at times—suffered pain the whole six months. The doctor would inject stuff in my arm to make me sleep; sleep still disturbed on account of this burn. It hurts so I get nervous. When I was hurt was in good condition, extra stout and big, weighed more than I do now, about 150 pounds, and now about 142; was earning $1.60 a day then. Have to dress my leg twice a day now, sometimes three times. Witness here unbandaged his leg and showed it to the jury from the knee down, also removed trousers

and showed jury his hip. The following questions were asked and answers made on plaintiff's cross-examination: "Q. Was the cob in the bucket? A. Yes, sir. Q. And then you would just lift it out of the bucket? A. Yes, sir; just jerk it out. Q. You would jerk the cob out of the bucket of oil? A. I took it out, yes, sir."

John E. Myers testified for plaintiff, substantially as follows: That he got orders from the superintendent at Centerville, Iowa, to "get busy at once and burn grass or plow or scalp grass to protect the company hay, or burn guards." Had done that for a number of years before, to protect the farmers' property—hay. When plaintiff was injured he was engaged in burning fireguard on Frank Maggert's meadow, which had been mowed some weeks before and had dry material of different kinds, weeds, etc. The burning of this fireguard was supposed to prevent the fire from spreading over the meadow in case an engine would throw a spark over the fence. We got permission from Maggert to do this work. Just before I saw plaintiff afire I had handed him a rag, and told him to help the boys, and not let the fire get to the hay, and that there was another rag hanging up back on the right-of-way fence, probably 150 yards, and I would go and get that and return and help. The fire was then burning towards this hay. I heard him holler, and turned and seen him coming towards me, with the flames all around his legs and climing up towards his body. I went running and meeting him, I clinched him and we went to the ground, and by that time some of the other boys were there and we got his pants and undersuit off as quick as we could. Witness then described the burns of the plaintiff substantially as stated by the plaintiff himself, and that plaintiff's injuries had never healed, and that he was not able to work more than a day a week since his injury.

As to the bucket containing the coal oil, the witness testified: Supposed to be a gallon bucket. I fetched it from home; had a candy bucket with water in it in which

they would wet the rags to put out the fire; struck the flames with the wet cloth to put it out. He was 75 to 100 yards from me when I first saw him afire. It was the duty of the section crew to burn the fireguards outside the right-of-way. We mowed the right-of-way before we burned that once each season. Whenever hay along the section was supposed to be in danger we usually got orders from the road master or superintendent to burn fireguards and protect this hay. Think we paid Mr. Maggert something for the privilege of burning fireguard on his land. Sometimes sparks from locomotives would light on the right-of-way and start fire, and sometimes light beyond the fence and start fire. The plaintiff worked regularly as a section hand in 1911, before his injury. Did the regular work of a section man and received the same wages. Ever since his injury, since he was burned, the plaintiff has kind of fainting spells, and when he gets tormented he doesn't seem to realize what he is doing, has the fainting spells two or three times a day. Never had trouble of that kind before he was burned. Cannot remember a day he didn't have such spells since his injury; have to dress his sores twice a day. His mother and himself do the dressing. The doctor is treating him now. He has discharges from his leg, a running sore now. The fainting spells are increasing. He never worked over a day or two a week since he was burned, and has done no work for the last four years. It was a mighty hard proposition for him to work; he suffers agony in this leg, and cannot sleep, and he will be in this sinking "capacity" and kind of unconscious, don't know what he is about or anything of the kind.

Three other witnesses who were working with the plaintiff at the time he was burned testified for plaintiff to burning the fireguard outside the right-of-way for the purpose of protecting the stacks of timothy hay in this meadow, and that no burning was done inside the right-of-way at all.

As to the gallon bucket one of the witnesses for plaintiff, C. H. Wood, said it had been around there a good while in the car, and used to carry water in to grind tools; been around there all spring and summer. It was an old rusty syrup bucket; it was rusty in the bottom and leaked. It leaked on his pants and shoes the day that plaintiff was injured when they set the fireguards; when he carried the bucket it leaked from the bottom; that was before plaintiff was injured. They used it once before, and it leaked just like it did when plaintiff was injured; this was a few days before, four or five or six, something like that, while it was being used to grind tools. It leaked ever since plaintiff began to use it, in the spring before plaintiff was burned. They had the coal oil and the cobs in this bucket the day plaintiff was injured, and plaintiff had used it in setting out the fire, before his injury. The witness had used the bucket, and it had leaked on his shoes and pants shortly before plaintiff was burned. He noticed it leaked. The foreman told plaintiff to set the bucket up and get a coat and help put the fire out. He noticed the condition of plaintiff's trousers at that time and that something had leaked upon them; he noticed that when plaintiff took the rag to fight the fire, which his father gave him about ten minutes before he was burned. It was coal oil on his trousers, about from his knee down. When plaintiff caught fire, it flashed up all at once, just like coal oil.

The other two witnesses for plaintiff, members of the crew, said they did not notice any leak in the bucket, although they saw it and handled it; that it did not leak. Three witnesses for defendants, who were members of the section crew and who were working with plaintiff when he was burned, also testified that they were burning the fireguards to prevent the hay of Mr. Maggert from catching fire from sparks from passing engines. That no fire was set inside or upon the right-of-way, although it would run over there in places. The purpose

was not to burn the grass or weeds on the right-of-way, but to burn a strip or a fireguard on the adjoining meadow. These witnesses, including Fogel, also testified that they saw and used the coal oil bucket the day of the fire and before that day, and it did not leak.

Defendant also produced a paper purporting to be signed by plaintiff's witness Wood, in which he stated that the bucket did not leak, but he, in effect, denied signing said paper. Plaintiff produced a paper which defendants' witness Fogel admitted he signed which contained a statement that the bucket did leak, but he said that he did not see that in it when he signed it. It was also shown by defendant that there was a bridge over a creek on the right-of-way near this meadow, and several other bridges on the section maintained by defendant John E. Myers as section foreman. Defendant also showed that it had paid out to farmers and town people for damages caused by fires, in the previous thirteen years $442,890, the smallest payment for any year being $13,950, and the greatest $69,156. Also that once a tree outside of, but near the right-of-way, burned and fell over on the right-of-way, and its branches struck and broke the windows in a passing car and injured a passenger. Other section men testified for defendant that fires had been communicated to bridges, telegraph poles and fence posts from fire on the right-of-way. Other railroad men testified for defendant that the object of burning the fireguards and the right-of-way was to keep the adjoining crops and also the fences, bridges and telegraph poles of the railroad company from being set on fire by sparks from engines. That the burning of fences would let stock on to the track, and might derail trains. Also that all trains of the defendant railroad running through Browning were interstate trains, running from Missouri into Iowa, and from Iowa into Missouri. They also carried local or intrastate traffic.

*As to plaintiff's injuries:* Dr. C. E. Jenkins testified for plaintiff, that he examined the plaintiff the first

time the fall before the trial; that plaintiff then had a large ulcerating surface on the left leg, about eight inches long and two and one-half inches wide. It occupied the entire middle third and part of the upper and lower third of the leg. The foot was swollen. The scar-tissue extended well up above the middle of the thigh. Above the knee the scar-tissue looked fairly healthy; below, not. Also found albumen in the urine indicating that the man had Bright's disease and inflammation of the kidneys. About one-eighth of his body was burned and covered with scar-tissue; that part of the skin would not function. Scar-tissue does not perform the function of healthy skin, it throws more weight upon the rest of the skin and upon the kidneys. The Bright's disease might have been caused by the burns he received. The witness also examined the plaintiff just before he gave his testimony and stated that he found the same ulcer he found last fall, except that it appeared to be a little deeper; the scar-tissue around the ulcer was rough and not healthy; the foot and ankle swollen; the scar-tissue above the knee looked healthy. He had a temperature of 100 and a pulse of 106, normal pulse is 72. "I noticed that he didn't remember me at all and I had trouble getting an intelligent answer. Normal temperature is 98½. His physical condition was about the same as last fall. The temperature and pulse would indicate the presence of poison in the system from the leg. A burn of a third or more of the skin would cause death. I think there is no permanent cure for plaintiff's injuries. To treat that limb properly and treat him properly he should be in a hospital under the care of a trained nurse with a physician in attendance. That limb should be dressed and taken care of anyway once a day for an indefinite time, might be as long as he lives, don't know. The expectancy of life for a boy twenty-three years old is about forty years. Trained nurse would cost about $35 a week. Physican ought to see him about twice a week, which would cost $4 a week; couldn't tell how long this would be required.

*Defendants' evidence as to plaintiff's injuries:* Five or six physicians testified for defendant, several of whom had examined plaitiff during or just before the trial. The substance of their testimony was that the ulcer on plaintiff's leg was eight inches long and one and one-half inches wide; the scar tissue where the skin was destroyed and would not function embraced one-sixteenth to one-twelfth of his entire body; while this threw an extra load on his kidneys, they hardly thought it sufficient to cause Bright's disease by itself; did not examine his urine; thought with proper treatment his injuries from the burns might be substantially healed, but one said, not without skin grafting, which he could not do; they found him nervous and confused in his mind, and he told one of them he had spells and was sometimes unconscious. Three of said physicians testified plaintiff had epileptic spasms before his injury; one, who testified he was the head of a department in the State Hospital for the Insane at Kankakee, Illinois; that he was formerly the family physician and assisted at the birth of plaintiff, and that plaintiff had epilepsy, both *grand* and *petit mal,* from infancy, for which he often treated plaintiff until he was eight or nine years old, when he (Dr. Tripper.) moved away from Missouri. These physicians said that epilepsy is incurable and progressive, and was not caused nor aggravated by burns, and that plaintiff's nervous and confused condition of mind and unconscious spells since being burned were, in their opinion, owing to his previous epilepsy, and not to the burns.

John E. Myers and his wife, the plaintiff's father and mother, testified in rebuttal that before this injury plaintiff never had any spasms or fainting spells, and no doctor ever told them or intimated to them that he had epilepsy. In surrebuttal some four or five people testified that the plaintiff's parents told them before plaintiff's injury that he was subject to spells ever since he was a child and was a great care to them. They did

not say fits or epilepsy, but just spells of some kind, and that the burn seemed to help his spells.

Among other instructions, the court gave the following for plaintiff:

"1. The court instructs the jury that if you believe and find from all the facts and circumstances proven in this case that the foreman was careless and negligent, as defined in these instructions, in directing and commanding plaintiff, if he did, to engage in working in and about the fire with an appliance handed him by the foreman, and if you find and believe from the evidence that plaintiff was in the exercise of reasonable care for his own safety in obeying said command, taking into consideration his position, age and experience and capacity at the time said command was given, and if you further find and believe from the evidence that plaintiff while working in obedience to said command, if any, as aforesaid, was burned and injured, then your verdict should be for the plaintiff.

"2. The court instructs the jury that the acts, knowledge and information of John E. Myers were the acts, knowledge and information of the defendant railroad company.

"3. The court instructs the jury that if you believe and find from the evidence that on the 12th day of July, 1911, the plaintiff was in the employ of the defendant Chicago, Burlington & Quincy Railroad Company, and that the defendant, John E. Myers, on said date was in the employ of said defendant, Chicago, Burlington & Quincy Railroad Company, as its foreman, in charge of plaintiff and plaintiff's fellow workmen mentioned in the evidence; that defendants negligently furnished plaintiff with the bucket mentioned in the evidence and that before and at the time said bucket was so furnished, if it was, the said bucket was leaky and was not in a reasonably safe condition for the purpose for which it was furnished to plaintiff, if it was; that said bucket contained coal oil at said time and that said

coal oil was leaking from said bucket; that at and before said time said defendant, Chicago, Burlington & Quincy Railroad Company, acting through its foreman, John E. Myers, by the exercise of ordinary care, could have known of the said leaky condition of the said bucket, if it was leaking, and that said bucket was not reasonably safe for the purpose for which it was being used, if you find that it was not reasonably safe for said purpose; that the plaintiff in obedience to the orders of the said foreman, if you find that plaintiff was so ordered, while plaintiff and said foreman were acting within the scope of their employment, engaged in setting out the fire mentioned in the evidence, and that while plaintiff was so engaged, and while exercising such care for his own safety as a boy of his then age, intelligence, experience and capacity would have ordinarily exercised under the same or similar circumstances, coal oil leaked from said bucket upon plaintiff's trousers and that plaintiff's said trousers thereby became saturated with said coal oil; that said John E. Myers while acting within the scope of his employment and performing the duties thereof by the exercise of ordinary care might have known that plaintiff's said trousers were so saturated with said coal oil, if they were; that thereafter the said John E. Myers while acting within the scope of his said employment as foreman negligently ordered and directed the plaintiff to engage in fighting the fire mentioned in the evidence for the purpose of preventing said fire from spreading to the hay mentioned in the evidence on a farm adjoining said railroad right-of-way; that the only purpose of the work in which plaintiff was engaged at the actual time of his injury in fighting fire, if he was, was to prevent injury to property on farm land adjoining said railroad right-of-way; that in obedience to said order and direction, if any, the plaintiff engaged in fighting said fire for the purpose aforesaid, and that while plaintiff was so engaged and while exercising such care for his own safety as would be ordi-

narily exercised by a boy of his then age, intelligence, capacity and experience his trousers were set on fire by reason of the coal oil with which they were saturated, if they were, coming in contact with the fire which the plaintiff was engaged in fighting, if he was, and that plaintiff was thereby burned and injured, then your verdict must be for the plaintiff.

"5. The court instructs the jury that if you find for the plaintiff you will assess his damages at such sum as you believe from the evidence will reasonably compensate him for the injuries, if any, received as a direct result of the burns suffered by him on the 12th day of July, 1911, and in arriving at the amount of the verdict you should take into consideration the nature and extent of plaintiff's injuries, if any, also all pain and suffering, both physical and mental, which you believe and find from the evidence the plaintiff has suffered or is reasonably certain to suffer as a direct result of said injuries in the future; also, his inability, if any, to earn a livelihood in the future; also, for the reasonable value of the medical attention and nursing which said injuries are reasonably certain to occasion in the future, if any, not to exceed, however, in all the sum of two hundred thousand dollars."

The court refused a demurrer to the evidence requested by defendant railroad at the close of plaintiff's evidence, and also at the close of all the evidence.

The court gave fifteen instructions for defendant, and refused five, which will be referred to in the opinion.

The jury returned a verdict for plaintiff for $20,000, and after being refused a new trial, defendant railroad appealed to this court.

I. Was the plaintiff, as a matter of law, engaged in interstate commerce when he was burned, as contended by appellant? We think not. The evidence, of all the witnesses engaged in the work, tends to show:

**Interstate Commerce.** That the fireguard was being burned solely to prevent sparks from defendant's engines communicating fire to the adjoining meadow and thereby spreading to the hay stacks of Maggert, the adjacent proprietor. That at the very time of plaintiff's injury the setting of the fire had been stopped, and he and all others ordered to and were engaged in putting out the fire which was spreading away from the right-of-way and towards the hay stacks, and that plaintiff was then wholly engaged in preventing the said hay stacks from destruction, and not in preventing anything on the right-of-way from injury and in saving defendant railroad from liability for damages under Section 9954, Revised Statutes 1919, which is as follows:

"Sec. 9954.—Each railroad corporation owning or operating a railroad in this State shall be responsible in damages to every person and corporation whose property may be injured or destroyed by fire communicated directly or indirectly by locomotive engines in use upon the railroad owned or operated by such railroad corporation, and each such railroad corporation shall have an insurable interest in the property upon the route of the railroad owned or operated by it, and may procure insurance thereon in its own behalf for its protection against such damages. [R. S. 1909, sec. 3151.]"

A very similar question was decided by the Court of Appeals of New York in Matter of Plass v. Ry. Co. 226 N. Y. 449. The New York statute required all railroad companies to cause "all Canadian thistles, white and yellow daisies and all other noxious weeds growing on lands owned or occupied by it, to be cut down twice in each and every year." Plass was a track laborer, and while engaged in mowing grass upon the railway right of way was poisoned by some noxious weed. The officials of the railroad testified that the nature and purpose of the work was "to prevent fire to bridges and trestles and spreading to adjacent property." The court said: "Whether or not the weeds on

the right-of-way were cut solely to comply with the railroad law and prevent fire to adjoining property or to protect bridges and trestles was a question of fact," for the jury. The court ruled in that case that, if Plass was cutting the grass and weeds simply to comply with the state statute, he was not engaged in interstate commerce. So in this case if plaintiff when injured was solely engaged in preventing fire spreading to the adjoining proprietor's hay, he was not then engaged in interstate commerce. This question was properly submitted to the jury by plaintiff's instruction numbered 3.

The validity of our statute, supra, has been upheld by this court in Mathews v. Railway, 121 Mo. 298, and other cases and by the United States Supreme Court in Railway v. Mathews, 165 U. S. 1, as a proper police regulation, to prevent the destruction by fire from sparks of locomotives of the property of others adjoining the railroad's right-of-way. In other words, the statute was not passed to protect the railroad's right-of-way or any structure upon it, but to protect adjoining properties.

The burden of proving that plaintiff at the very time of his injury was engaged in interstate commerce was upon the defendants (Osborne v. Gray, 36 Sup. Ct. Rep. 486; 1 Roberts on Fed. Liability, secs. 449 and 466), and where the evidence is conflicting in that regard, it is a matter for the jury to pass upon. The most that can be said in this case, owing to the admissions in the petitions in the plaintiff's former suits, is that the evidence was conflicting as to whether when plaintiff was injured he was solely engaged in saving the farmer's hay. But such prior pleadings are not conclusive evidence, and the probative force thereof was for the jury.

*A few other authorities*: In Delaware Railroad v. Yurkonis, 238 U. S. 439, a miner was injured while preparing to mine coal which was to be transported from one state to another, and it was held he was not engaged in interstate commerce when injured. So an employee in a machine shop where engines used in state

and interstate commerce are repaired, is not engaged in interstate commerce when repairing the machinery in such shop. [Shanks v. Railroad, 36 Sup. Ct. Rep. 188.] Or when repairing in such shop an engine used in both state and interstate commerce. [Railroad v. Winters, 37 Sup. Ct. Rep. 170.] In Illinois Central Railroad v. Behrens, 233 U. S. 473, and Chicago, Burlington & Quincy Railroad v. Harrington, 36 Sup. Ct. Rep. 517, 518, it was held that when an employee is engaged in work pertaining to both classes of commerce, the railroad company is not liable under the Federal statute for his injury unless the particular service in which he was employed at the time of the injury was a part of interstate commerce, even though upon completion of such work the employee was to engage in work which was a part of interstate commerce. So that the fact in this case that plaintiff was engaged in interstate commerce in the morning before his injury in working upon the track as a section man and expected to return to such work after burning said fireguard, does not make the work of burning said fireguard interstate service. In New York Central Railroad v. Carr, 238 U. S. 260, l. c. 262, it is said: "Owing to the fact that during the same day railroad employees often and rapidly pass from one class of employment to another, the courts are constantly called upon to decide those close questions where it is difficult to define the line which divides the state from interstate commerce." "The true test is the nature of the work being done at the time of the injury." [Railroad v. Welsh, 242 U. S. 1. c. 306.]

In this case if plaintiff had been injured while setting fire to the grass on the right-of-way to prevent fires from consuming the bridges or trestles or fences or telegraph posts of the railroad it might be well said that he was engaged in interstate commerce, the same as if he had been engaged in repairing the track, in which case it is well established by many authorities cited by the learned counsel for appellant that he would have

been engaged in work which was a necessary part of interstate commerce. But if, when injured, he was engaged simply in burning a fireguard outside the right-of-way to prevent the destruction of the adjoining farmer's hay and save defendant from liability under our statute, as there was evidence tending to show and the jury found the fact to be, he was not engaged in interstate commerce when injured, and the Federal statute is not in the case.

The fact that the destruction of the farmer's hay imposed a liability on the railroad company which the plaintiff was endeavoring to prevent, is of itself strenuously argued by appellant's learned counsel as sufficient to make his work interstate commerce, because, if not prevented, a great burden and expense would be imposed upon interstate commerce in which the defendant railroad was engaged, as well as being engaged in intrastate commerce. If this argument was sound every service of any employee of a railroad company intended to save it harmless from damages under police regulations of the State, or torts at common law, would be interstate commerce if the railroad was engaged in both state and interstate commerce. This cannot be true. The connection of the work being done with interstate commerce must not be too remote. [Shanks v. Railroad, 36 Sup. Ct. Rep. 188.] We have examined the cases cited by appellant, and they are all cases where the employee at the time of his injury was actually engaged in some service that was a practical part of interstate commerce, as, for instance, the cases just mentioned of section men working upon the railroad track itself. The main case relied on by appellant's learned counsel is Southern Pacific Co. v. Ind. Comm. of California, 174 Cal. 8, approved in P. & R. Ry. Co. v. Di Donato, 41 Sup. Ct. Rep. 516. In that case it was held that a gate man in the employ of a railroad using its tracks for both state and interstate commerce at a point where the tracks crossed a public street, who was killed by an intrastate

train when he started across the track to back away a horse and wagon so that he could lower the gate, was engaged in interstate commerce, because his work was to prevent collisions between vehicles and all trains passing over the crossing, so as to prevent blocking traffic at the crossing, which would have delayed trains at other points including interstate trains. In other words, that he was then engaged in keeping "the tracks at the crossing clear and unimpeded for the passage according to schedule of interstate passengers and freight carried by" the railroad. In the case before us the burning of the hay stacks which plaintiff was endeavoring to prevent when injured, would in no way interfere, directly or indirectly, with the operation of trains upon the track of the defendant, either state or interstate trains. We must rule this point against the appellant.

II.  Appellant also contends that there was no evidence of negligence in furnishing a leaking bucket, and no evidence that the oil leaked on plaintiff's trousers. If the positive evidence of plaintiff's witness Wood, that

Leaking Bucket: Sufficient Evidence.

the bucket did leak that day and had leaked for some days before and that he saw coal oil on plaintiff's trousers just prior to his injury, and the circumstantial evidence that the flames suddenly flashed up on plaintiff's trousers, making a volume of black smoke like the burning of coal oil, is to be credited—which was for the jury—there was abundant evidence to go to the jury as to the negligence of defendant in furnishing a leaky bucket which caused the injury.

III.  As to defendant's refused instructions:

(a)  Instruction B was properly refused because it told the jury to entirely disregard the fact that plaintiff was a minor, less than twenty-one years old, when

Minor Plaintiff.

injured. He was then about thirteen or fourteen years old and we cannot say as a matter of law that he was in all respects to be regarded

as an adult in passing on his contributory negligence. [Jackson v. Butler, 249 Mo. 342; Moeller v. United Rys. Co., 242 Mo. 721.]

(b)  Instruction C told the jury there was no evidence that defendant negligently furnished plaintiff a **Leaky Bucket.** leaky bucket. This point has just been disposed of against appellant.

(c)  Instruction D was simply a cautionary instruction to the effect that the jury should determine the case **Corporation.** according to the instructions which it was their duty to obey and the evidence, regardless of the fact that one of the parties was a corporation and one an individual and without prejudice towards one or sympathy towards the other. The giving of such an instruction, which is usual, would perhaps not have been reversible error, but neither was its refusal reversible error. [Stauffer v. Railroad, 243 Mo. l. c. 335.]

(d)  Instruction E told the jury that if plaintiff's burns were caused by the work he was doing, and not because of any negligence of defendant, the jury should find for defendant. The refusal of this instruction was not reversible error, because it was, in **Predicated Facts: Included in Other Instructions.** substance, embraced within other instructions given for defendant. Defendant's given Instruction 5 told the jury that if plaintiff's trousers caught fire by reason of coming in contact with the fire plaintiff was fighting, and not by reason of coal oil on his trousers, plaintiff could not recover. Defendant's given instruction numbered 7 required the jury, before they could find a verdict for plaintiff, to find that defendant knew, or by the exercise of ordinary care could have known, that the bucket containing the coal oil was leaking, in time to have secured another bucket before plaintiff's injury occurred. Defendant's given instruction numbered 11 put the burden on plaintiff of proving the negligence of defendant in furnishing a leaky bucket and that it was the direct cause of plaitiff's injury without any negligence on his

part contributing thereto. Instruction numbered 12 given for defendant told the jury that plaintiff, by engaging in work as a section hand for defendant, assumed all the ordinary risk and danger of his employment, not only so far as known to him, but so far as could have been known to him by the exercise of ordinary care.

(e) Instruction F told the jury that if plaintiff "caused the coal oil to drip or drop out of the bucket when *he jerked the cobs out of the bucket,*" and he did not exercise ordinary care and such lack of care contributed to his injury, plaintiff could not recover. This tells the jury that plaintiff jerked the cobs out of the bucket. Plaintiff did not firmly testify he jerked the cobs out of the bucket, but in answer to the question whether he would "just lift them out," said, "Yes, sir; just jerk it out," and in answer to the further question whether he "would just jerk the cobs out" said, "I took it out, yes, sir." Plaintiff evidently meant the same thing by "jerk it out" as by "took it out." At least, the jury might have so inferred from his testimony. So that it was not justifiable to assume in an instruction that plaintiff "jerked" the cobs out of the bucket, as was done by defendant's refused Instruction F and thus might have caused the coal oil to splash on his trousers. Said instruction was properly refused.

*Assumption of Disputed Fact.*

IV. As to error in plaintiff's instructions given to the jury:

(a) Plaintiff's Instruction 1 told the jury that if they believed from the evidence that the foreman was *negligent* "as defined in these instructions" in directing plaintiff to engage in working in and about the fire with an appliance handed him by the foreman, and that plaintiff himself exercised reasonable care, considering his age and experience and that plaintiff was injured while working in obedience to such command, then plaintiff could re-

*Reference to Other Instructions.*

cover. The appliance here referred to evidently is the bucket containing the oil, when read in connection with plaintiff's Instruction 3. The instructions must be read together, especially so as said Instruction 1 says "negligent" "as defined in these instructions," and when so read we find no objection to said Instruction 1 given for plaintiff. If the bucket furnished by the foreman was and had been in a leaky condition, as defined and required to be found in plaintiff's instruction numbered 3, then it was negligence on the part of the foreman to command plaintiff to engage in work therewith in and about said fire, as submitted in said Instruction 1.

(b) Plaintiff's said Instruction 1 was not erroneous in requiring the jury to consider plaintiff's age, capacity and experience, he being but thirteen or fourteen years old and not shown to have had much, if any, previous experience in fighting fires. [Jackson v. Butler, 249 Mo. 342; Moeller v. United Rys. Co., 242 Mo. 721.]

*Age and Capacity of Plaintiff.*

(c) Nor is plaintiff's instruction numbered 3 erroneous because it conflicts with defendant's given instruction numbered 1, in that the latter tells the jury "there was no evidence that defendant negligently ordered plaintiff to take a position not reasonably safe in front of the fire." There is nothing in plaintiff's Instruction 3 as to defendant's negligently ordering plaintiff to take a position not reasonably safe in front of the fire, as an isolated fact of negligence. We see no conflict between the two instructions.

*Conflicting.*

(d) Said instruction numbered 3 given for plaintiff was not erroneous because it required the jury to consider plaintiff's age, capacity and experience, as already determined. If, therefore, defendant's instructions numbered 5, 6, 8, 9 and 12 conflicted with said Instruction 3, in this regard, by omitting to refer to plaintiff's age, capacity and experience, they were erroneous, and not plaintiff's said instruction numbered 3, and de-

*Conflict on Matter of Age, etc.*

296 Mo.—13.

fendant cannot complain of such conflict as reversible error.

The same thing is true, if plaintiff's said Instruction 3 conflicts with defendant's instruction 2, which told the jury there was no evidence that the foreman knew, or by the exercise of care, could have known that plaintiff's trousers were saturated with coal oil before the injury. As we have seen, there was evidence that the bucket leaked that day and for some time before and that the witness Wood saw coal oil on plaintiff's trousers just before his injury. Such evidence was sufficient to warrant the jury in finding that the foreman knew or could have known by the exercise of due care, that plaintiff's trousers were saturated with coal oil from the leaking bucket prior to his injury. If the bucket leaked at and before plaintiff's injury to the foreman's knowledge, actual or constructive, defendant is charged with knowing the oil might saturate plaintiff's trousers and cause him to be burned.

Knowledge of Foreman.

(f) The objections to plaintiff's instruction numbered 5 are not well founded. It is a mistake on the part of appellant's learned counsel, as a reading of the instruction will show, to contend that said instruction permits a recovery for medical attention or nursing from July 12, 1911, or before plaintiff was of age, or at any time except in the future after the trial, or that there was no evidence of his inability to work or earn a livelihood, except through his own failure to use proper means to effect a cure. Said Instruction 5 is without error.

Medical Attention.

VI.  As to the amount of the verdict:  We cannot say that it is so excessive that all the facts and circumstances considered, the jury did not fairly weigh the evidence as to the character and effect of plaintiff's injuries and as to the amount of his compensation under the evidence and instructions of the court. We do not feel justified in interfering with the amount of the verdict.

Excessive Verdict.

Judgment affirmed. *Ragland, C.,* concurs; *Brown, C.,* absent.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. All of the judges concur.