## OLLIE W. WILLIAMS, Respondent, v. FRED W. FLEMING and FRANCIS M. WILSON, Receivers of the Kansas City Railways Company, Appellants.

### Kansas City Court of Appeals. June 10, 1924.

1. **NEGLIGENCE: Parent and Child: Mother of Child Run Over by Street Car Held Not Guilty of Contributory Negligence as Matter of Law in Allowing Child to be Unattended upon Street.** Where three-year-old child injured by being run over by street car was allowed to play around in yard and was last seen by his mother about seven minutes prior to time of injury when he was standing on her front porch, that she had not sent him anywhere and did not know he was out of yard, evidence *held* not to conclusively show that mother was guilty of contributory negligence.

2. **NEGLIGENCE: Contributory Negligence no Defense Where Case Was Submitted upon Humanitarian Theory.** Where case was tried and submitted upon charges of "ordinary" negligence and also upon humanitarian theory and defendant demurred on ground plaintiff was guilty of contributory negligence, the demurrer being general, was properly overruled, as such negligence is no defense under humanitarian theory.

3. **EVIDENCE: Where no Request Was Made to Strike Out Evidence There Was no Error in Its Admission.** Evidence that shortly before car stopped, after running over three-year-old child, motorman was

(563)

seen looking to one side and that there was a man standing by the motorman, *held* not improperly admitted where no request to strike out evidence as to man was made.

4. ————: Where Objections to Evidence Were Sustained and Defendants Went into Matter on Cross-examination, Admission of Such Evidence Was Not Error.   Admission of evidence that shortly before plaintiff's child was run over by street car, motorman was seen looking to one side where a man was standing by him, was not error, where defendants, after their objections had been sustained, went into matter on cross-examination and left the evidence in such shape that possibly witness saw the man by motorman before child was struck.

5. ————: Evidence Held Admissible as Tending to Corroborate Other Evidence.   Evidence that a tall man was standing by motorman's side, shortly before street car struck child, *held* not prejudicial nor inadmissible as it tended to corroborate other testimony that motorman was talking to man beside him as car approached the child.

6. WITNESSES: Cross-examination of Matters Brought Out on Direct Examination Held Proper.   Where motorman on direct examination testified that he first saw child when he was fifty or sixty feet away and then when he was eighteen or twenty feet away the child suddenly ran out into the street, cross-examination of motorman, eliciting testimony that after he saw child his car went twenty or thirty feet, *held* proper.

7. EVIDENCE.   No Error in Examination of Expert Witness as to Distance in Which Car Could Have Been Stopped.   In action for damages as result of street car running over child, there was no error in permitting expert witness to state distance in which car could have been stopped, where he had formerly operated particular type of car with similar equipment over same portion of street in question and was acquainted with the grade there, though hypothetical question did not include grade.

8. INSTRUCTIONS: Instruction Based on ''Ordinary'' Negligence Held Not in Conflict With Another Based on Humanitarian Theory. An instruction based on "ordinary" negligence requiring plaintiff to exercise ordinary care for safety of her child *held* not in conflict with another instruction based on the humanitarian theory.

9. ————: Instruction on Humanitarian Theory Held Supported by Evidence.   Instruction embodying humanitarian theory *held* not erroneous because there was no evidence to show that motorman could have stopped car in time to avoid collision though expert witness for plaintiff used the word "minutes" when he meant a less interval of time.

Williams v. Fleming et al.

10. **DAMAGES: Statute Prohibiting School Children from Engaging in Gainful Occupation During School Hours Held Not to Render Instruction on Measure of Damages for Loss of Services of Minor Child Erroneous.** In an action for loss of services, an instruction on measure of damages authorizing a finding "for loss of service of her said minor son during his minority and until he arrives at the age of twenty-one years," is not rendered erroneous by reason of provision in Laws of 1921, page 184, prohibiting children under fourteen (14) years of age from engaging in any gainful occupation during hours when public schools in district in which child resides are in session.

11. **INSTRUCTIONS: Where Neither Party Could be Prejudiced by Refusal to Give Instruction, Refusal Thereof Held Not Prejudicial.** Refusal of instruction telling jury it should not be influenced by fact that one of parties was an individual and the other a corporation *held* not prejudicial nor ground for reversal.

12. **————: Under Humanitarian Rule Motorman Must Exercise Care That an Ordinarily Prudent and Skillful Motorman Would Use Under Similar Circumstances.** Refusal of defendant's instruction that jury must find particular motorman in charge of car in question could have stopped it in the exercise of ordinary care was not erroneous, as the operator must exercise the care that an ordinarily prudent and skillful motorman would use under the same or similar circumstances.

13. **TRIAL PRACTICE: Discharge of Jury Being Discretionary with Trial Court Its Failure so to do Was Not Error.** Where improper and prejudicial argument of counsel was objected to and court requested to reprimand counsel and discharge jury, whereupon court gave reprimand and argument proceeded, action of court in not discharging jury *held* not error as such was a matter in the discretion of trial court.

14. **————: Improper Argument Held Insufficient to Cause Discharge of Jury Where Court Reprimanded Counsel Therefor and Instructed Jury to Disregard the Remarks and be Guided Solely by the Evidence.** In an action by a widow for loss of services as result of injuries received by her minor child, argument of plaintiff's counsel that "You can't go home tonight and look that wife and mother of yours in the face and say, 'if I were gone and my baby was compelled to support you,'" *held* insufficient to warrant discharge of jury in view of reprimand given counsel and instructions that jury should disregard remarks and be guided solely by the evidence.

15. **DAMAGES:** In Action for Loss of Services of Minor Child Caused by Injuries Resulting in Loss of His Leg, a Verdict of $4,000 Held Not Excessive. In an action for loss of services where three-year-old minor child received injury resulting in amputation of leg, atrophy of muscles and hospital, surgical and other expenses amounting to $300, a verdict of $4,000 *held* not excessive.

Appeal from the Circuit Court of Jackson County.—*Hon. Thad B. Landon,* Judge.

AFFIRMED.

*Virgil Yates* and *Mosman, Rogers & Buzard* for respondent.

*Charles N. Sadler* and *Mont T. Prewitt* for appellant.

TRIMBLE, P. J.—Plaintiff, a widow, brought this action to recover damages arising from expenses made necessary, and loss of services caused by, the alleged negligence of defendants' motorman in running a street car over her minor son, cutting off his leg. There was a verdict and judgment for plaintiff in the sum of $4000, from which defendants have appealed.

The petition alleged that plaintiff was the mother of the child, Dallas Williams, whose father was dead, and she was therefore entitled to the child's custody, control and earnings; that defendants, as receivers, were operating a system of electric street railway cars in Kansas City and particularly on Indiana Avenue between 33rd Street and Linwood Boulevard; that on June 20, 1921, while so operating a certain street car on said portion of Indiana Avenue, they ran over and crushed said child's leg so that it had to be amputated between the hip and knee; that they:

"Negligently and carelessly failed to sound a signal of warning of the approach of said street car," etc., and—

"Negligently and carelessly failed to keep and maintain a reasonable and vigilant lookout," etc.; that after

the street car had struck and thrown the plaintiff's son upon the fender of said street car, they—

"Negligently and carelessly failed to stop said street car in time thereafter to prevent the injuries . . . although they could have so stopped said car by the exercise of ordinary care." And that

"Although they saw, or by the exercise of ordinary care might or could have seen the plaintiff approaching a position of peril and danger and in a situation of peril, and that the plaintiff('s son), because of his tender years, was oblivious to said peril and danger because of the approach of said street car, in time thereafter for the said agents, servants and employees of the said defendants to have stopped said street car by the exercise of ordinary care, or to have slackened the speed thereof, or to have sounded a warning of the approach thereof and to have thereby averted the said injury . . . yet they negligently and carelessly so failed to do."

Indiana Avenue lies north and south, and has electric street railway double-tracks thereon, occupying the middle portion of the Avenue, the east track being the one on which the northbound cars ran. Thirty-third street, running east and west, crosses Indiana Avenue at right angles.

The son, a child three and one-half years old, was, on the afternoon of the above-named date, run over by a northbound street car on Indiana Avenue, whereby his left leg was crushed, necessitating its amputation about four inches above the knee.

There was evidence in plaintiff's behalf, given by persons on the street near the scene of the accident, which tended to show that the street car stopped at 33rd street to discharge or take on passengers, and then started on its northward journey, moving slowly at the rate of from five to eight miles an hour; that at a short distance north of the north line of 33rd street the car struck the child and it was caught on the fender and carried thereon for fifty or sixty feet when it rolled off

to one side, a wheel passing over its leg, and even then the car continued on to a point at least seventy and perhaps two hundred feet from where the baby lay before it stopped, that being brought about by the frantic efforts of those on the street who saw the tragedy and realized the situation. There was evidence amply tending to show that from the time the street car left the north line of 33rd street until just before or at the time the car stopped about seventy feet or more north of or beyond where the child was run over, the motorman was not looking toward the front and keeping a lookout but had his face turned to the east or right side of the car, apparently talking to a passenger standing near him, and that no warning signal or bell was rung. There was also evidence that a car going at five miles per hour could be stopped in ten feet, at eight miles in fifteen feet, and that the child was on the track at a time when the car was far enough away to have afforded the motorman ample time to have stopped before striking the child, had the motorman been looking.

It is contended that defendants' demurrer to the evidence should have been sustained because plaintiff was guilty of contributory negligence as a matter of law in allowing her child to be thus unattended upon the street. Plaintiff's home was on the west side of and fronted east on Bales Avenue, which is the first street east of and parallel to Indiana Avenue, said home, consequently, being on the side of Bales Avenue next to Indiana Avenue with a vacant lot between plaintiff's home and said last-named Avenue. The home was 3314 Bales Avenue. The child was allowed to play around in the yard with a brother and two sisters. Plaintiff was not in the habit of sending her said son to any place and on this occasion she had not sent him anywhere and did not know that he was out of the yard. Plaintiff and her daughter were carrying dirt in a tub from Indiana Avenue to make some flower beds which were located next to the front porch of her house. When she last saw

him before his injury, he was standing on the front porch and this was seven minutes prior to the time he was run over. Plaintiff attempted to show that she did not permit him to run on the streets, but was prevented from doing so by defendants' objection. Under these circumstances we do not see how we would be justified in saying plaintiff was conclusively guilty of contributory negligence. [O'Flaherty v. Union Ry. Co., 45 Mo. 70; Albert v. St. Louis, etc., R. Co., 192 Mo. 665.] We may observe here that the case was tried and submitted not only upon the charges of "ordinary" negligence in failing to warn and failing to keep a lookout, but also upon the humanitarian theory embodied in the last specification of negligence hereinabove set forth. The defendants' demurrer was general, and under the humanitarian theory, contributory negligence is not a defense. [Czezewzka v. Benton, etc., R. Co., 121 Mo. 201; Reynolds v. Kinyon, 222 S. W. 476, 482.] The case of Degnan v. Doty, 246 S. W. 922, 925, relied on by defendants has no application whatever to this case, for in the case cited plaintiff knowingly exposed the child that was injured to the hazard of the tree falling on her.

In addition to witnesses on the street who testified that, before and up to the time the child was struck, the motorman had his face toward the east, apparently talking to a tall man at his side, plaintiff placed on the stand Gardner, a passenger seated in the rear of the car. He testified that the car stopped at 33rd street and after it left 33rd street and before it again came to a stop, he looked toward the front end of the car and saw a tall man standing near the motorman. He was asked what the motorman was doing at that time and he answered that "he appeared as if he was in conversation with the man that stood at his right." An objection to this was made by defendants and the court sustained the objection and struck the answer out. The witness was then asked whether there was a man standing near the motorman at that time and he answered that there was,

and he was a tall man. He was then asked which way the motorman's face was turned at the time he (the witness) looked up and saw the tall man standing by him, and the witness answered, "Toward the east." This was likewise objected to and the court sustained the objection and struck the answer out. Witness was then asked when was it with reference to the time the car left 33rd street that he looked up and saw the motorman, and the witness answered that he could not give the exact time, "but it was very close to the time that the—perhaps an instant or two before the car stopped."

This was also stricken out by the court. Witness testified that, up to the time the car stopped, nothing had attracted his attention to the fact that *something had occurred,* nothing was said by anybody that attracted his attention, and the first he knew that *something had happened* was when the car came to a stop; that after the car left 33rd street and before it stopped he heard no bell.

On cross-examination, defendants elicited from the witness that it was when the car got to 33rd street or "soon after that that I looked to the front of the car and saw this man."

"Q. Saw this man? A. Saw this man talking." Defendants further elicited the testimony that witness did not know an accident had occurred until the car stopped. And defendants sought to have the witness say it was *after* the car stopped that he saw the man up in the front vestibule but the witness persisted in saying that it was before the car stopped, he could not "say as to the exact time, but it was shortly previous." The point now raised is that the witness did not notice the motorman with his face turned to the east until just before the car stopped (which of course was after the child had been struck) and therefore, by this time the motorman would naturally be looking around and hence it was error for the court to permit testimony that the motorman was looking east at the time this witness was re-

ferring to. There are at least two answers to this contention. 1. The court at the instance of defendants struck out all of the witness's testimony except that there was a man standing by the motorman, and no request was ever made to strike this out. 2. Defendants, on cross-examination, although their objections had been sustained, chose to go into the matter and in that cross-examination left the evidence in such shape that possibly the witness saw the tall man by the motorman *before* the baby was struck, in which later situation we could not say that the admission of the evidence, even had it been allowed to remain, was error. As to the other answer to the contention, the mere fact that a tall man was standing by the motorman's side after the car left 33rd street was not prejudicial nor was it inadmissible, as it, to that extent, tended to corroborate the testimony of one of the witnesses on the street who said that the motorman was talking to the man beside him as the car approached the baby. The evidence was that this witness tried to attract the attention of the motorman but failed.

The motorman in testifying for defendants denied that he had his face to the east or was talking to a tall man in the vestibule or that any man was there for him to talk to. He said that after he had crossed 33rd street, he noticed a little child facing north and playing in the parkway between the east curbstone and the curb near the second trolley pole; that when he got within eighteen or twenty feet of the pole, or within that distance of being even with it, the child suddenly ran west until it came so close to the track that the car fender caught it and threw it down, the child seeming to be in the clear, but the car seemed to run over something and he stopped the car with its rear end about six or eight feet past the point where the boy lay; that the child ran about as fast as a grown person could walk—about four miles an hour; that he, the motorman, was going twelve or fifteen miles per hour and he stepped on the sand, sounded his gong

and put on the emergency all at the same time; that the child never got on the track but only about three inches of the east rail where it was struck by the corner of the fender.

It is contended that on the cross-examination of the motorman, plaintiff's counsel erroneously attempted to enlarge the defendants' liability and asked a series of improper and prejudicial questions as to what the motorman *did* when he saw the child playing in the parkway. The point is, not that the court admitted any such prejudicial testimony but that, by the questions asked, the jury would get the impression that the motorman should have begun to stop or slacken speed before there was any indication of the child's intention to run into the street. We have carefully read the record and find that so far from any indication of an attempt to create such impression or to prejudice the jury, there was a very earnest endeavor on the part of plaintiff's counsel not to do so and not to go beyond the limits of the court's ruling. The motorman, on direct examination, did not state when it was he first saw the child after he crossed 33rd street, and plaintiff's counsel, on cross-examination, asked him when it was. The motorman said it was when the child was fifty or sixty feet away. He was then asked as to the *speed* of his car at that time. Objection being made, the court ruled that plaintiff could show the speed and the motorman testified he was going twelve or fifteen miles an hour. He was then asked what he did at this time, but this was objected to and the objection was promptly sustained. Defendants' counsel moved to discharge the jury. The court admonished plaintiff's counsel not to get outside of the pleadings and overruled the motion to discharge. Thereafter the witness was asked how far the car went after the motorman first saw the child until he saw the child leave the curb and go into the street, objection was made to this but the objection was overruled and the answer was "twenty or thirty feet I should judge." This was proper cross-examina-

tion. It bore directly on the motorman's testimony for he said he first saw the child when he was fifty or sixty feet away and then when he was eighteen or twenty feet away the child suddenly ran west out into the street "as fast as his little legs could carry him," and now on cross-examination he said his car went twenty or thirty feet after he first saw him and before it started into the street. Of course, the motorman was not called upon to anticipate that the child might run in front of his car until he manifested an intention to do so. The court in its ruling plainly said so. But it was competent to show the speed of the car and the general situation. The court sustained the objection made to the question as to what the motorman did to prevent a collision when the child was in the parkway. The matter was not gone into again; and we fail to see where the jury were improperly influenced.

There was no error in the examination of the expert witness as to the distance in which the car could have been stopped. The witness had formerly operated this particular type of car equipped as it was over the particular portion of the street in question, and was acquainted with the grade there. Hence the hypothetical question did not have to include the grade, as it was not asked in what distance any car generally could be stopped but in what distance could this car at this place be stopped. [Kaminski v. Tudor Iron Works, 167 Mo. 462, 466.] After defendants' objections were made to plaintiff's hypothetical question, upon inquiry of plaintiff's counsel a number of things were suggested which the latter promptly adopted and incorporated in the question and the court finally asked defendants' counsel if they had any other matters to suggest that should be included, and received a reply in the negative. We find that some of the things now claimed to have been omitted were, in fact, included. The objection that the question did not include the distance in which the car could have been stopped by a reasonably skillful motor-

man after he discovered, or might by reasonable care have discovered, the "little child in danger" instead of in what distance it could have been stopped under ordinary circumstances, was not suggested at the trial. [Jackson v. Kansas City Rys. Co., 232 S. W. 752; Pennington v. Kansas City Rys. Co., 201 Mo. App. 483.]

The contention that plaintiff's instruction 1 conflicts with instruction 2 because the first requires that the plaintiff was exercising ordinary care for the safety of her child, while in the second the jury could find for plaintiff even though she was negligent in allowing her son on the street, overlooks the fact that one was based on the "ordinary" negligence alleged in the petition while the second was based on the humanitarian theory. There was no conflict on this account. [Czeze- wzka v. Benton, etc., R. Co., 121 Mo. 201, 214.]

It is urged that plaintiff's instructions embodying the humanitarian theory were erroneous because there was no evidence to show that the motorman could have stopped the car in time. But manifestly there was ample evidence to show this; and the only ground for the contention now made is that defendants, on cross-examination of plaintiff's expert witness as to the *time* it would take to apply the stopping power effectively, not the *distance* it would run before coming to a stop was entirely overthrown and destroyed. It is true the witness used the word "minutes" when the record shows that what he meant was an interval of time, and he demonstrated before the jury the movements to be made in stopping the car. Besides, the motorman's testimony as to the movements he says he made in stopping the car shows that no such length of time as "minutes" is necessary to stop. The testimony in the record as to the distance the car was from the child when he was first seen on the track and walking *east* (instead of west as the motorman claims), and the distance in which a car could be stopped, cannot be thus completely overturned and conclusively destroyed by a witness's careless use of the term "minutes."

The instruction on the measure of damages is attacked. It told the jury that if they found the issues for the plaintiff it would then become their duty to assess her damages in such sum as they believed from the evidence would be a fair and reasonable pecuniary compensation to her; *first,* for any sums she has necessarily expended or incurred liability for, and permitted them to find the hospital charges and surgeons' bills, and second, "for the loss of service of her said minor son during his minority and until he arrives at the age of twenty-one years," directly caused by the defendants' negligence, if any, less the reasonable cost of keeping and maintaining her son during that time. The complaint against the instruction is directed to the quoted portion hereinabove shown, and the gist of the point is that the enactment of Laws of 1921, p. 184, "prohibiting children under fourteen years of age from engaging in any gainful occupation during the hours when the public schools in the district in which the child resides are in session," renders the instruction erroneous. We fail to see how it does. The case of Hornbuckle v. McCarty, 243 S. W. 327, 330, cited in support of this point does not hold that the regular instruction on the measure of damages has been changed by the statute. Reference to the statute was made in connection with the question of whether the verdict of $10,000 was *excessive.*

Defendants' instruction C was refused. It was the usual cautionary instruction telling the jury it should not be influenced by the fact that one of the parties was an individual and the other a corporation. In State v. Talbott, 73 Mo. 347, 357, a somewhat similar instruction was given and objected to by the defendant. The Supreme Court said it "might have been omitted" but it was not seen how the defendant was prejudiced. In Feary v. Metropolitan St. Ry. Co., 162 Mo. 75, 97, a similar instruction was given but plaintiff objected and it was held that it could not be seen how it could possibly have prejudiced the plaintiff. If, in these cases, neither

the plaintiff nor the defendant could be prejudiced by the giving thereof, it would seem that refusal thereof would not be prejudicial nor ground for reversal. [See Myers v. Chicago, etc., R. Co., 246 S. W. 257, 265.]

Defendants' refused instruction K sought to tell the jury in substance that even if they believed from the evidence that "some motorman" could have stopped the car after the time the son left the curb, or from the time he got in a position of peril, and before he was struck, this was not enough, but they must believe that "this particular motorman" in charge of the car in question could have stopped it in the exercise of ordinary care. The evidence shows that this particular motorman went to work for defendants in the middle or latter part of May and the collision occurred on the 20th of the succeeding June. He had had no other experience as a motorman, save the usual period of training he went through before being placed on a car as a regular motorman. He was working as such when the injury occurred. The question was not what a motorman of little experience could have done, but what a reasonable skillful and prudent motorman, in the exercise of ordinary care, could have done under the circumstances. Otherwise, defendants could escape liability by merely having a deaf, dumb and blind paralytic for a motorman. No doubt, the humanitarian rule deals only with the "actual facts of a present situation" and with the required care under the "then existing conditions" and the defendant must exercise ordinary care with "the means at hand." [Henson v. St. Louis, etc., R. Co., 256 S. W. 771; Carl v. East St. Louis, etc., R. Co., 258 S. W. 72, 75.] But, of course, these principles have no reference to the lack of skill or experience of the operative in question but to the surrounding conditions and circumstances under which the accident occurred. The operative must exercise ordinary care, and to do that he must exercise the care that an ordinarily prudent and skillful motorman would use under the same or similar circumstances.

It is insisted that the court erred in failing to discharge the jury and in not fully and properly reprimanding plaintiff's counsel for improper and prejudicial argument to the jury.  The record shows that in the closing argument to the jury plaintiff's counsel, in answering a contention made by defendants, stated, "You can't go home tonight and look that wife and mother of yours in the face and say, 'If I were gone and my baby was compelled to support you'—" He got no further.  Objection was made to this statement and counsel for plaintiff withdrew it.  Counsel for defendants asked the court to instruct the jury to disregard the remark, which was done.  Counsel for defendants then asked that the jury be discharged.  Plaintiff's counsel then apologized for the remark; the court admonished plaintiff's counsel to keep within the record, saying, "It is improper."  The motion to discharge was overruled.  Defendants' counsel then said, "We want to further object to court's not fully and completely admonishing the plaintiff's counsel for the improper and prejudicial argument just made."  The court then stated that the argument was entirely improper and that counsel should not have made it and that the jury should wholly disregard it "in every way, shape and form;" ". . . you must be guided solely and alone by the evidence and this is not a part of it and does not belong here and counsel will refrain therefrom and stay strictly within the record."  Plaintiff's counsel again apologized and no further objection or request by defendants' counsel was made.  The argument was not repeated.  The matter of discharging the jury under such circumstances is in the discretion of the trial court to a large degree.  The court did everything that counsel for defendants requested except to discharge the jury.  We do not feel that we would be justified in disagreeing with the trial court under the circumstances.  [Eddings v. Childress, 253 S. W. 130; Crocker v. K. C. Rys. Co., 243 S. W. 902, 908; Weinlein v. Peoples, 241 S. W. 645.]

It is last insisted that the verdict is excessive.  The facts in this connection show that plaintiff incurred sur-

geon's bills in the sum of $250 and hospital bills to the amount of $50.85, making a total of $300.85. On account of the youth of the child at the time the leg was amputated, the thigh bone will only be one-fifth its normal length at the maturity of the child. In addition to this the muscles of the leg and those of the buttocks will atrophy "from the leg out." For this reason the stump will not be as good for the use of an artificial limb had the leg been amputated in adult life. It may be that by the assistance of a masseur the child can wear an artificial leg but this is problematical. The surgeon obtained what is called "a good result" in the amputation of the leg. The case was tried a year and five months after the injury. At the time of the trial the surgeon examined the ends of the stump and found it to be in good condition in that the skin and flesh were thoroughly united. The health of the child was normal. There was a difference of five inches between the length of the two thigh bones. The amputated thigh is about one-half its normal size on account of the wasting of the muscles. We have read the decision of the Supreme Court in the case of Hornbuckle v. McCarty, supra, where a recovery was permitted of $5000 for loss of services caused by the death of a minor. We find nothing in that case that would justify us in interfering with the amount of the verdict in this case.

The judgment is affirmed. All concur.